# EXHIBIT A

Cathy Brooks-McCollum

1          Q.   All right.  Now, under "optional

2     coverage 2," under "directors and officers

3     liability," it says "we will pay those sums

4     that the insured becomes legally obligated to

5     pay--

6          A.   The insured is Emerald Ridge.

7          Q.   -- as damages because of wrongful

8     acts committed by an insured solely in the

9     conduct of their management responsibilities

10    with the condominium association."

11         A.   That's Emerald Ridge.  That's when

12    you have where an insurance policy can be

13    liable for insuring the directors of the

14    corporation, they can be liable for both parts.

15    I'm very clear on the law.

16         Q.   Now --

17         A.   And they're not Emerald Ridge.  The

18    suit was filed as them as individuals and then

19    separately Emerald Ridge Corporation.

20         Q.   Let me go back.  You have brought a

21    lawsuit against individuals who were members at

22    one time of the board of directors?

23         A.   No, the ones that they were not

24    members of the board of directors at any point.

Cathy Brooks-McCollum                                          16

1          Q.   At any time?

2          A.   Ken Shareef, he's not even a

3    stockholder and you guys have insured him.

4    Maudy Melville was not a member of the board,

5    nor was Renford Brevard and nor was Mark Martel

6    who basically decided to take over the

7    corporation and then Mr. Brevard decided to go

8    ahead and join back in.

9          Q.   When you sued them originally, what

10   court did you sue them in?

11         A.   I originally I sued them in

12   chancery court just for them to basically pay

13   me the fees incurred as basically cleaning

14   Emerald Ridge up, the front of walls, and as

15   well as for the chancery court to basically

16   clarify for them to rule since they could not

17   understand them.  It was very simple, for 500

18   and something dollars.

19         Q.   So your original lawsuit in the

20   court of chancery was for money that you

21   expended somehow?

22         A.   Correct, as a director.

23         Q.   Why did you expend the money?

24         A.   Because they asked for the services

1    and the person performed services and I believe

2    in paying people when they perform the

3    services.  When they would not pay them, so I

4    paid them.

5            Q.    Who asked for what services, that's

6    what I don't understand?

7            A.    That was Ken Shareef and them asked

8    for the services.

9            Q.    What services did they ask for?

10           A.    They asked for the powering washing

11   of the monuments.

12           Q.    They asked for power washing of

13   what?

14           A.    Monuments.

15           Q.    What's a monument?

16           A.    When you first come in you have the

17   monuments on each side of the development.

18           Q.    Okay.  And when Ken Shareef asked

19   for that work to be done, what authority did he

20   have it under?

21           A.    At that time he believed that he

22   could be a board member.

23           Q.    Because he believed he was a board

24   member?

Cathy Brooks-McCollum                    18

1          A.   Correct.

2          Q.   All right.  What was his position

3    as a board member?

4          A.   Not only was he not a stockholder

5    or director, he claimed the president position.

6          Q.   So he claimed that he was the

7    president?

8          A.   Until the attorney told him he

9    can't be.

10         Q.   And he asked that something be

11   power washed?

12         A.   That's when other members of the

13   corporation brought it to my attention that he

14   can't even make any decision as a board because

15   he's not even a homeowner.

16         Q.   Was there power washing done?

17         A.   Yes, there was.

18         Q.   Who did it?

19         A.   I think it's Aqua Wash.  I'm not

20   sure.

21         Q.   And approximately when was this

22   done, do you recall?

23         A.   2003.  The month I don't know.

24         Q.   Now, when that was done, when that

Cathy Brooks-McCollum                                    19

1    power washing was done, were you a member of

2    the board?

3            A.   Yes, I was.  According to the

4    Supreme Court of Delaware I was a member of the

5    board at all times in any of these cases.  I'm

6    going by what the court has said, so now.

7            Q.   You were on the board when the

8    power washing was done?

9            A.   Correct.

10           Q.   Did you have a vote in that

11   decision to power wash?

12           A.   There wasn't a vote.  It was

13   conversations back and forth through e-mail.

14   There was no vote.

15           Q.   Were you involved in seeing the --

16           A.   Yeah, they asked me would I oversee

17   it.

18           Q.   Oversee what?

19           A.   Making sure it gets done.

20           Q.   And did you oversee it?

21           A.   That's why I paid for it.  Since I

22   got the guy to do it, I was not going to not

23   pay him.

24           Q.   Okay.  And the power washing was

Cathy Brooks-McCollum                    20

1    done.  You paid for it out of pocket?

2         A.  Yes, I did.

3         Q.  Or did you pay for it out of funds?

4         A.  I paid for it out of my pocket

5    because they refused to him.

6         Q.  Who refused to pay him?

7         A.  Ken Shareef and Maudy Melville and

8    Renford Brevard who none of them were elected

9    at all.

10        Q.  Why did they refuse to pay him?

11        A.  Because they said that, oh, well,

12   we wanted you to come back and tell us what the

13   price was.  I was like, that was not the

14   conversation, tell them what the price was.

15        Q.  So you're saying they said that

16   they wanted just a price and you understood --

17        A.  I have e-mails.  I know.  They said

18   so that was not part.  The only conversation

19   that was taking place was with Ken Shareef and

20   myself.

21        Q.  Okay.  Ken's position is, make sure

22   I understand it, that he only wanted you to get

23   a price, but your position is that's not true,

24   it was authorized that they do the work?

Cathy Brooks-McCollum                                              21

1           A.   That's my position at the time, but

2    now when I came to light he had no position

3    that he could stand on.

4           Q.   All right.  And how much did you

5    pay for this?

6           A.   Power washing was 185.

7           Q.   That was out of your own pocket?

8           A.   Correct.

9           Q.   Did you ask to be reimbursed?

10          A.   I most certainly did.

11          Q.   And were you ever reimbursed?

12          A.   Even the corporation told me they

13   would reimburse me and they refused to

14   reimburse me when the corporation told them to

15   reimburse me and when I asked them to be

16   reimbursed.  So the corporation took a vote to

17   reimburse all her money that she expended thus

18   far, including legal fees, and they said no.

19          Q.   Who is "they"?

20          A.   At that time it was Ken Shareef,

21   Renford Brevard and Maudy Melville.  They said

22   they were discussing it with other people so

23   they didn't tell who the other people were.

24          Q.   When you said the board agreed or

1    the condominium agreed --

2              A.    The corporation.    There was a

3    corporation meeting called where there were

4    numerous members there.    They said why don't

5    you just pay her the money.    She expended it.

6    Pay it to her.    As well as give her all the

7    costs she's incurred.    They said they were not

8    going to do that.    They did not pay that until

9    after some time when some lawyer told them you

10   should have paid her.

11             Q.    Have you ever been been paid?

12             A.    No.

13             Q.    So you're still out of pocket the

14   $185?

15             A.    I'm out of pocket way more than

16   $185 at this point.

17             Q.    With regard to the Aqua Wash?

18             A.    Correct.

19             Q.    Now, was there any other thing like

20   that where you made payment out of your own

21   pocket?

22             A.    I made payment out of my pocket to

23   basically cover myself in these proceedings

24   although I'm a director.

Cathy Brooks-McCollum

```
 1            Q.   Forget the proceedings for a

 2    minute.  Let's just get to the things like

 3    this.  There was the Aqua Wash.  Was there

 4    anything else done?

 5            A.   No, there was not anything else

 6    that I paid.

 7            Q.   Now, when you brought the lawsuit

 8    in chancery, did you include in that a claim

 9    for the $185?

10            A.   Yes, I did.

11            Q.   And as I understand it, that's

12    never been decided by the court yet?

13            A.   It's reassigned now to a superior

14    court judge.

15            Q.   It's a superior court judge?

16            A.   Yeah.

17            Q.   When was that one?

18            A.   A few months ago from what I

19    understand.

20            Q.   So you're no longer --

21            A.   Judge Vaughn is handling it.

22            Q.   You're no longer in chancery, is

23    that what you're saying?

24            A.   They reassigned it to Judge Vaughn
```

40

```
 1    proceeding.

 2          Q.  What do you mean "a court

 3    proceeding"?

 4          A.  As part of exhibits in chancery

 5    court they had an exhibit saying outlining a

 6    meeting they had in a meeting after the

 7    corporation had already told them several

 8    months ago pay up.  They then decided they were

 9    going to have their own little meeting and they

10    took a vote saying pay the power wash.

11          Q.  Who took that vote?  I'm not sure I

12    understand.

13          A.  Whoever the persons who were

14    claiming that they were the board at that time.

15    It was several other people other -- Ken

16    Shareef eventually resigned once he realized

17    that he had no point and had the authority to

18    appoint these people or to be a director.

19    Renford Brevard has now resigned as well.

20          Q.  But your understanding was that it

21    was a board meeting that agreed to pay the

22    $185?

23          A.  It was a meeting where they claimed

24    that they were the board.  People that just
```

1    somehow became a board.  They never were.

2            Q.  And you're saying you would not

3    accept it now anyway?

4            A.  I'm not accepting illegal funds.

5    They're not authorized to give me money from

6    the corporation.  They never were elected.  I

7    was on the board at that time still.  No court

8    -- so if I'm on the board still, I'm not going

9    to say you can give me money now, we're in the

10   middle of litigation, from corporation funds

11   when you're not authorized to make that

12   decision.

13           Q.  If they were authorized to make the

14   decision, would you take the money?

15           A.  Not just the $185.  They should

16   have just paid the 600 or five something at

17   that particular point instead of going around

18   vandalizing my family property and harassing my

19   family and other things.

20           Q.  Let me get to that.  I'm trying to

21   get one step at a time.  The first thing is the

22   $185.  The second monetary amount you're

23   claiming is the expenses of litigation?

24           A.  Correct.

Cathy Brooks-McCollum                46

1          A.    Right.    I just told you, I said

2    effective the 30th.    I'm still living where I

3    was.    As of the 30th we will no longer have a

4    home or anywhere to live.

5          Q.    Well, you said that you had to move

6    because of action by State Farm?

7          A.    Because of the criminal activity

8    that State Farm funded which encouraged

9    terroristic activity.

10          Q.    And what activity did State Farm

11    fund?

12          A.    Basically they funded those people

13    so that they can have the funds to basically

14    harass my family.    Basically --

15          Q.    What people are they funding?

16          A.    The ones that are claiming to be

17    directors.    The ones that basically vandalized

18    our property.    The ones that sent items through

19    the mailing inferring that we hurry up and move

20    and get out of here, which, mind you, came from

21    Maryland where State Farm is.

22          Q.    Let's back up.    What proof do you

23    have that anybody harassed you?

24          A.    Like I said, I will have witnesses

1    that will come to court.  When we come to court

2    witnesses that basically --

3          Q.   Tell me your witnesses.

4          A.   I first have to find out.  I'm not

5    going to give their names.

6          Q.   You've got to give me their names.

7          A.   The corporation.  Half of the

8    members of the corporation are so afraid

9    because even when they walked by and saw our

10   vehicles damaged, they were like, don't tell me

11   they resorted to this.

12         Q.   I need to know the witnesses who

13   claim that they saw someone harassing you or

14   destroying your property.

15         A.   As far as the person seeing them

16   destroy my property, I looked out the window

17   and I saw the people who basically vandalized

18   my property.  They were certain members of the

19   board.

20         Q.   Who vandalized your property?

21         A.   Certain members of the board.

22         Q.   "Certain" is not going to do it.

23   Name them for me because I'm going to talk to

24   them.

Cathy Brooks-McCollum                                    48

1          A.   Certain members of the board.  You

2     can talk to all of them.

3          Q.   I don't want to talk to all of

4     them.  I want to talk to the ones that harassed

5     you.

6          A.   Like I said, as far as I'm

7     concerned, all of them harassed me.

8          Q.   I don't know care just as far as

9     you say.

10         A.   And that once I have an attorney I

11    will tell you.  You will get all the other

12    discoverable --

13         Q.   You said to me --

14         A.   -- including for me to have

15    fingerprints done on the envelope that came

16    from Maryland where State Farm is located where

17    they basically instructed us to move quickly.

18    And including the person who lives eight miles

19    within State Farm who kept calling our house.

20         Q.   We're going to get there.  One step

21    at a time.  You just told me that you saw

22    people vandalizing your property; is that

23    correct?

24         A.   I said I saw people outside.

Cathy Brooks-McCollum                    49

1   Whether or not did I see them when they

2   actually vandalized my property, whether or not

3   that's irrelevant.

4           Q.   It's not irrelevant.

5           A.   Number one, I lived there ten

6   years.  Nothing has ever happened to our

7   residence.  That's up to the jury to decide

8   whether or not they basically believe these

9   people based on their actions committed these

10  crimes.

11          Q.   Did you see anybody --

12          A.   Again, when I have --

13          Q.   -- vandalize your property?

14          A.   -- an attorney, I already said

15  that's a question you will have to have the

16  court basically go ahead.  So we can move you

17  on.

18          Q.   We're not moving on.  I want to

19  make sure I understand.  Did you see someone --

20          A.   What I understand is that I will

21  not be answering that question.  I'm invoking

22  my fifth on that question until such time I

23  have an attorney to basically say which

24  portions I need to basically give to you and

Cathy Brooks-McCollum                    50

1    which portions I do not.

2            Q.   I didn't ask you who at this point.

3    Did you in fact see someone vandalize your

4    property?

5            A.   Again, when I have an attorney that

6    question will be answered.  At this point I'm

7    invoking my fifth.  I'm not giving -- nobody

8    has assisted me this far in these proceedings

9    other than family members.

10           Q.   And why are you invoking your fifth

11   amendment rights?

12           A.   Because I don't know what you're

13   able to ask at this point without my attorney

14   being here and what you're not able to ask.

15   State Farm has not answered or replied to any

16   of my questions or any of my subpoenas or

17   anything.  So, no, I'm not going to allow my

18   family to have been victimized and harassed and

19   then victimized again for trying to follow the

20   law.

21           Q.   All right.  I'm going to ask it

22   another way because I am going to go to the

23   court on this.

24           A.   Okay.

Cathy Brooks-McCollum                    51

1          Q.   So let's get the questions down

2     here.  Have you ever seen anybody vandalize any

3     of your property?

4          A.   Again, I'm invoking my fifth until

5     I have and attorney because my constitutional

6     rights have been violated.

7          Q.   Have you, in fact, in court

8     proceedings, stated that State Farm employees

9     vandalized your property?

10         A.   I said I believe State Farm had

11    something to do with it.

12         Q.   What is the basis for your saying

13    that?

14         A.   Because a person within eight miles

15    of State Farm kept calling my home harassing us

16    and I have received a letter from Maryland

17    where State Farm is located and the policy was

18    executed instructing us to move, amongst other

19    things.

20         Q.   Who wrote you the letter?

21         A.   They were punks.  They didn't sign

22    their names.  They basically were punks.

23         Q.   So somebody sent you a letter

24    that's unsigned --

1           A.   Anonymously.

2           Q.   -- asking you to move?

3           A.   And so it comes from Maryland.

4    That just seems strange.

5           Q.   And why is that strange?

6           A.   Because why would it come from

7    Maryland when State Farm is the one that's in

8    Maryland and then I was getting calls from a

9    person within eight miles of State Farm's

10   office.

11          Q.   And who called you?

12          A.   I don't have their name but that I

13   can give you the person's name and address.   I

14   made sure I got that and their phone number.

15   Do I have that with me?   No.

16          Q.   Somebody called you when?

17          A.   They called me several times.

18          Q.   Saying what to you?

19          A.   Basically I didn't answer the phone

20   when they called.

21          Q.   Then if you didn't answer --

22          A.   I didn't answer the phone.   At one

23   particular time my daughter answered the phone.

24          Q.   And what did your daughter tell you

Cathy Brooks-McCollum                           53

1    was said?

2           A.   That they were basically saying

3    that we need to move whoever it was.  And my

4    daughter is nine years old.

5           Q.   Saying you needed to move?

6           A.   Right.

7           Q.   Okay.  And you believe that was a

8    State Farm person who did that?

9           A.   I believe that State Farm is behind

10   all of this.  And based on State Farm's

11   history, they practice criminal activity.  When

12   you have a policy put in place under all cases

13   lie, don't pay your policy.  They have a policy

14   that says that.  So should I not believe that

15   they didn't do that.

16          Q.   What other criminal activity of

17   State Farm are you aware of?

18          A.   As I said, basically I believe

19   State Farm was behind those acts basically

20   trying to basically so they wouldn't have to

21   pay the corporation for the damages it caused

22   once they realized they made a mistake and I

23   believe that the damages that they basically --

24   for the damages and the harm they caused my

Cathy Brooks-McCollum                                    54

1    family.  My daughter was crying.  When our

2    vehicle was vandalized, my daughter was very

3    upset and my kids slept in my room with me for

4    two weeks.

5            Q.   That could be, but I'm trying to

6    figure out why you determined it's State Farm.

7    Do you understand proof?

8            A.   I already told you, if I'm getting

9    calls from Maryland, I get a letter from

10   Maryland, and then I believe that -- do I

11   believe that it was State Farm who physically

12   came there?  No.  I believe that State Farm

13   basically incited these things to happen and to

14   occur.

15           Q.   Based upon the two facts then, that

16   you got a phone call from Maryland?

17           A.   Several phone calls that came from

18   Maryland.

19           Q.   Although only one of them was

20   answered?

21           A.   I don't know how many was answered.

22   My daughter may not have said.  She may have

23   answered the phone and never thought anything

24   about it.  She doesn't say everything when she

Cathy Brooks-McCollum                    55

1    answers the phone.  My son could have answered

2    the phone, which he wouldn't be able to give

3    anything because he basically -- which he does

4    as well when he answers the phone.

5              Q.  Are you aware of your son or your

6    daughter answering the phone and telling you

7    that someone was calling to harass you?

8              A.  As I said, I'm not aware of -- no.

9    All I know is I took down the person's name,

10   backtracked where they live, their address and

11   basically I had the phone number and I got who

12   they were.

13             Q.  That was one time?

14             A.  And they were calling constantly

15   every day for several weeks.

16             Q.  But you didn't answer the phone?

17             A.  When I basically after I realized

18   where it was coming from, Maryland, and then I

19   saw that -- then I basically identified that it

20   was like within eight miles.  That will be

21   addressed when that person is subpoenaed for

22   court proceedings.

23             Q.  Okay.  You have the person's name?

24             A.  I have their name and their

1   address.

2           Q.   And where is the address?

3           A.   That's at home.  I don't have that

4   with me.  Like I said, I have it written on

5   State Farm's policy.

6           Q.   But you have that information?

7           A.   Yeah, I can e-mail you that.

8           Q.   Could you do that?

9           A.   Mm-hmm.

10          Q.   But you have no proof other than

11  the fact that this person called you from

12  Maryland that he had anything to do with State

13  Farm?

14          A.   Basically if you read case law,

15  fraud and crimes can be basically inferred from

16  circumstantial evidence.  O.J. Simpson was

17  convicted on circumstantial evidence.

18          Q.   Well, I hate to disagree with you,

19  but I think he was found not guilty.

20          A.   Well, they were trying to convict

21  him -- my error -- on circumstantial evidence.

22          Q.   I want to go back and make sure I

23  understand the harassment claim.  Because

24  somebody called you --

Cathy Brooks-McCollum                        57

```
 1          A.   That is not the harassment claim.

 2    The harassment claim is also with their

 3    attorney basically coming there lying before

 4    the corporation, which that causes harassment

 5    and things against my family.  We don't walk

 6    our neighborhood anymore.  That's why we're

 7    moving, because we don't want to end up in jail

 8    because I can very much tell you that if

 9    something happened to my children, I don't know

10    how I would compose myself.

11          Q.   I want to know what the attorney

12    said that was a lie?

13          A.   Read the briefs.  That's a bunch of

14    stuff.  I can't tell you everything.  I can't

15    quote everything verbatim.

16          Q.   What do you believe he said?

17          A.   Everything he basically said before

18    that corporation was a lie.

19          Q.   Everything was a lie?

20          A.   Everything that he basically said

21    surrounding the rights of these people was a

22    lie.  When you basically are sitting there, if

23    they're starting off telling you that they're

24    directors even though they were never voted,
```

1    that's lie.  So one lie leads to a lot of lies.

2          Q.  Well, the first lie was he said

3    that they were directors?

4          A.  He said that they were directors.

5    He said that he was working for State Farm.  He

6    was working for them.  He was working for so

7    forth.  Basically if you look at the pleading

8    he also basically went before the chancery

9    court and he basically gave his blessing in a

10   proceeding before a chancery court that it was

11   okay to basically vote on ratifying the actions

12   that the people basically did illegally.  And

13   there's a case law that says that voting on

14   ratifying illegal actions is not -- can't

15   rectify the problem.

16         Q.  One of the court's opinions

17   indicated that the board of directors removed

18   you as an officer.

19         A.  When I basically would not confirm

20   with them.  They were not board of directors.

21   They basically said, like the chancery court

22   said, they can't -- said we can't rule until we

23   actually have all the facts of who was the

24   board of directors.  We already know the