ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

Cathy D. Brooks-McCollum                    **CIVIL ACTION NO:  04-419 (JJF)**
& On behalf of
Emerald Ridge Service Corporation Derivative Action      **JURY TRIAL REQUESTED**
As a Director
PO Box 12166
Wilmington, DE  19850
(302) 521-1241
mccollumc1@comcast.net
**(PLAINTIFF)**

     vs.

State Farm Insurance Company
**(DEFENDANTS)**

## PLAINTIFF'S REPLY BRIEF ON SUMMARY JUDGMENT

```
   F I L E D

 DEC 1 0 2007

  U.S. DISTRICT COURT
DISTRICT OF DELAWARE
```

/s/ Cathy D. Brooks-McCollum
PO Box 12166
Wilmington, DE  19850
(302) 521-1241
October 30, 2007

## TABLE OF CASES AND CITED AUTHORITIES

Pages

*Raytheon Co. v. Continental Cas. Co., 123 F. Supp. 2d 22, 32 (D. Mass. 2000);* ......................................... 3

*A&M Gregos, Inc. v. Robertory, 384 F. Supp. 187, 193 & 194 n.16 (E.D. Pa. 1974* ..................................... 3

See, e.g., Lachmund v. ADM Investor Servs., Inc., 191 F.3d 777, 782-83 (7th Cir. 1999)............................ 3

*Rankin v. City of Philadelphia, 963 F. Supp. 463, 471-72 (E.D. Pa. 1997)* .................................................... 3

*See Gould Elecs. Inc. v. United States, 220* t ............................................................................................... 3

*Petrillo v. Bachenberg, 139 N.J. 472, 479 (1995) (citations omitted).* ........................................................... 4

*Carvalho v. Toll Bros. and Developers, 143 N.J. 565, 572-73 (1996).* ........................................................... 4

*Rosenblum, supra, 93 N.J. at 333 (citing Ultramares v. Touche, 174 N.E. 441 (N.Y. 1931)).* ...................... 4

*See also St. Paul Fire & Marine Ins. Co. v. Touche Ross & Co., 507 N.W.2d 275, 280 (Neb. 1993)* ............ 4

# STATUTES AND REGULATIONS

*Pages*

*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.7* .................................................................................. *1*
*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.1* .................................................................................. *1*
*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.2* .................................................................................. *1*
*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.3* .................................................................................. *1*
*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.* .................................................................................. *1*
*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.* .................................................................................. *1*
*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.6* .................................................................................. *1*
*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.7* .................................................................................. *1*
*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.8* .................................................................................. *1*
*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.9* .................................................................................. *2*
*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.10* .................................................................................. *2*
*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.12* .................................................................................. *2*
*Delaware Title 18 Insurance Of Delaware CODES 1.2.1.13* .................................................................................. *2*
FED. R. CIV. P. 12(b)(7) ..................................................................................................................... 2
FED. R. CIV. P. 19(b)........................................................................................................................... 3

## ARGUMENTS & SUPPORT

**I.  PLAINTIFF'S RESPONSE TO DEFENDANT CLAIMING THAT THEY THE STATE FARM POLICY DOES NOT PROVIDE ANY RIGHT OF INDEMNIFICATION TO THE PLAINTIFF SINCE SHE WAS NOT LEGALLY OBLIGATED TO PAY DAMAGES**

Plaintiffs Emerald Ridge Service Corporation and Cathy Brooks-McCollum clearly outlined their basis and reasoning and when Indemnification is provided for in their opening brief. and would hope that the court goes by case law, federal law in support of such which showed cases where these defendants are and have acted in such unethical manners in many of their cases.

**II.  PLAINTIFFS BEING OFFERED ANY FORM OF SETTLEMENT**

Again Plaintiffs Emerald Ridge Service Corporation and Cathy Brooks-McCollum addressed this fully in their Opening Brief, where they outlined that any settlement offer made by these TORTFEASOR Defendants would not make Plaintiff's whole and left all parities and made offers after said time proceedings had began, which were far below any offer acceptable and in violation of all of Delaware Title 18 Insurance Of Delaware CODES (and specifically quoting 1.2.1.7:  1.2.1.1, Misrepresenting pertinent facts or insurance policy provisions relating to coverage at issue, 1.2.1.2 Failing to acknowledge and respond within 15 working days, upon receipt by the insurer, to communications with respect to claims by insured's arising under insurance policies, 1.2.1.3 Failing to implement prompt investigation of claims arising under insurance policies within 10 working days upon receipt of the notice of loss by the insurer, 1.2.1.4 Refusing to pay claims without conducting an investigation based upon all available information when the notice of loss received by the insurer indicates that such an investigation is necessary to properly determine such a denial of payment, 1.2.1.5 Failing to affirm or deny coverage or a claim or advise the person presenting the claim, in writing, or other proper legal manner, of the reason for the inability to do so, within 30 days after proof of loss statements have been received by the insurer,1.2.1.6 Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims in which liability has become clear, **1.2.1.7 Compelling insured's to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts which they might be entitled to under normal fair claims evaluations,** 1.2.1.8 Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material

1

accompanying or made part of an application, 1.2.1.9 Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge of the insured, 1.2.1.10 Making claims payments to insured or beneficiaries not accompanied by a statement setting forth the coverage under which the payment has been made, 1.2.1.12 Failing to promptly settle claims, where liability has become clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage,1.2.1.13 Failing when requested to promptly provide an explanation of the basis in the insurance policy in relation to facts or applicable law for denial of a claim or for the offer of a compromise settlement. Such explanation may be made verbally but when given, must be documented in the claims file.

How could these TORTFEASOR defendants have felt that $185.00 would make Plaintiff's Emerald Ridge Corporation and Cathy Brooks-McCollum whole, when if the courts would review Exhibit F Of Plaintiff's Brief outlines that Defendants are incorrect in their statement. Defendants originally made an offer in 2004 of an amount around $1,100, but only if Plaintiff allowed them to continue posting slanderous, and false information across the Internet. Several years (Approximately 3 years to be exact) and several courts down the line and Plaintiffs had obtained and paid counsel, Defendants came back and made an offer of $185.00 to Plaintiffs Emerald Ridge Service Corporation and Cathy Brooks-McCollum **(Exhibit AS)**, of which even they knew was illegal and against the Delaware Insurance Code. Defendants state a matter of fact without including the item in which they reference an item not included as part of their items to be submitted as part of evidence, nor did they include it with this pleading, as well as they refused to supply it to Plaintiff as part of Discovery. Whereby, Plaintiff has attached a Motion to Dismiss/Strike all of their Reply or the portions in which they refer to a document not submitted as an exhibit, part of discovery and refused to be supplied to Plaintiff still to date. However, with Plaintiff hereby submitting Exhibit AS it should confirm that these defendants continually violated Delaware Title 18 Insurance Code.

Plaintiff discusses many of the conditional offers made by Defendant's of which all were a violation of the Delaware Title 18 Insurance Code. These defendants knew that the amounts were substantially less than the amounts, which anyone would deem reasonable persons would deem fair and/or normal as stated in their being in violation of 1.2.1.7 of Delaware Title 18. These parties used strong-arm tactics in trying to prevent Plaintiffs

2

from receiving what they were rightfully entitled to per the Insurance Policy, and their actions as Joint

Tortfeasors. If it were not for these Defendants these acts would not have continued, or began.

## III.    DEFENDANT'S ARE LIABILITY AS JOINT TORTFEASORS

Pursuant to Rule 19 of the Federal Rules of Civil Procedure. FED. R. CIV. P. 12(b)(7). Under Rule 19(a),

a person is a necessary party to the litigation and can be joined as Joint Tortfesors if: **(1)** complete relief is not

obtainable if the person is not joined, **or (2)** the person claims an interest in the subject of the litigation and

resolution of the litigation without the person's involvement would **(i)** impair or impede the person's ability to

protect the interest or *(ii)* leave the current parties with a *"substantial risk of incurring double, multiple, or*

*otherwise inconsistent obligations by reason of the claimed interest. "* Plaintiff has argued that Defendants actions

and along with other Joint Tortfeasor are what placed the Corporation in the position it is now in and leaves the

Corporation open for substantial risk, and this is well pleaded within Plaintiffs Opening Brief. Under Rule 19(b),

if a person fitting the description in Rule 19(a) cannot be joined, the court must determine whether the litigation

should proceed without said person or whether said person is an *"indispensable"* party requiring dismissal of the

action. In making this determination, the court must consider four factors: [F]irst, to what extent a judgment

rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to

which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be

lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether

the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. This court itself stated when

Plaintiff filed a Motion to Join that it did not feel that JOINDER was necessary for these proceedings to continue,

and would be going against its' own ruling should it now state that JOINDER is necessary.

FED. R. CIV. P. 19(b). When making a Rule 19 determination, the Court may consider evidence outside

of the pleadings. *Raytheon Co. v. Continental Cas. Co., 123 F. Supp. 2d 22, 32 (D. Mass. 2000); A&M Gregos,*

*Inc. v. Robertory, 384 F. Supp. 187, 193 & 194 n.16 (E.D. Pa. 1974)*

Plaintiffs has clearly submitted sufficient evidence to infer that most of Defendants' interactions and

negotiations regarding these pleadings were with Defendants through correspondence made between them and

their attorney's, which again has been submitted to the court by Plaintiff's with Exhibits, outlining that Edward

Kafader was acting in his actions for and on behalf of Defendant State Farm.

Furthermore an agent or a joint tortfeasor does not need to be joined under Rule 19. Plaintiffs have complained throughout these proceedings that Defendants are liable as a principal-agent relationship with Joint Tortfeasor Kafader and other Joint Tortfeasors. *See, e.g., Lachmund v. ADM Investor Servs., Inc., 191 F.3d 777, 782-83 (7th Cir. 1999)(suggesting that a principal-agent relationship must be alleged in the complaint)*; *Rankin v. City of Philadelphia, 963 F. Supp. 463, 471-72 (E.D. Pa. 1997)(*same). Plaintiffs have seeked to hold Defendants are and were liable under a principal-agent or joint Tortfeasor theory, and have so alleged in their Complaint. *See Gould Elecs. Inc. v. United States, 220* transaction, and that a principal-agent relationship existed.

Even Defendants themselves argued and the courts agreed that all the claims being brought against the parties who were and acted jointly with Defendants were borne out of the same actions and Defendants State Farm Agreed that they were. See *Civil Action Brooks-McCollum& Emerald Ridge Service Corp. vs. Shareef, et.al,No. 05C-12-198 (MMJ) (Del Superior), Brooks-McCollum&Emerald Ridge Service Corp. vs. Sharee et.al 1:04-cv-00703-JJF (US District Court DE), Brooks-McCollum&Emerald Ridge Service Corp. vs. Shareef et.all No. 05-1264 (US Court Appeals 3rd Circuit), McCollum&Emerald Ridge Service Corp. vs. Shareef et.all No. 147-N (Chancery Court DE)* Plaintiffs state as a matter of fact rulings made by this court itself and by the Judge overseeing these proceedings, on rulings he himself made. Even Defendants themselves state by way of each and every Admissions submitted that they gave Attorney Kafader the authority to act on their behalf and all his actions were approved by them, by way of several Exhibits, including their Admissions. The US Court of Appeals have already stated by way of their opinion that State Farms hired GOON attorney that it saw criminal actions, violations of the Rules Of Professional Conduct, etc. Even, Defendants Attorney hired to commit the crimes on their behalf did not deny the allegations, he and his firm just stated that they were immune from prosecution. Now they will have the courts to discredit statements made by they themselves and their own attorneys that they were all acting jointly.

## IV.   DEFENDANT'S DUTY TO PLAINTIFFS EMERALD RIDGE SERVICE CORP. & CATHY BROOKS-McCOLLUM

The determination of the existence of a duty is a question of law for the court and the court would have to conclude that Defendants had a duty to Plaintiffs in all court actions and now admit that Plaintiff Brooks-McCollum was a validly elected Director, although they denied this in their Answer to Plaintiffs Complaint filed with this court and did nothing to rectify their error, once made known. *Petrillo v. Bachenberg, 139 N.J. 472, 479*

4

*(1995) (citations omitted)*. The question of whether a duty exists implicates many factors, including the foreseeability of harm, fairness and public policy. *Carvalho v. Toll Bros. and Developers, 143 N.J. 565, 572-73 (1996)*. Courts have traditionally held that imposing liability on accountants requires a privity or privity-like relationship between the claimant and the negligent actor. *Rosenblum, supra, 93 N.J. at 333 (citing Ultramares v. Touche, 174 N.E. 441 (N.Y. 1931))*. in *See also St. Paul Fire & Marine Ins. Co. v. Touche Ross & Co., 507 N.W.2d 275, 280 (Neb. 1993)*

## V.    DEFENDANT'S DUTY TO PLAINTIFFS EMERALD RIDGE SERVICE CORP. & CATHY BROOKS-McCOLLUM

The determination of the existence of a duty is a question of law for the court and the court would have to conclude that Defendants had a duty to Plaintiffs in all court actions and now admit that Plaintiff Brooks-McCollum was a validly elected Director, although they denied this in their Answer to Plaintiffs Complaint filed with this court and did nothing to rectify their error, once made known. *Petrillo v. Bachenberg, 139 N.J. 472, 479 (1995) (citations omitted)*. The question of whether a duty exists implicates many factors, including the foreseeability of harm, fairness and public policy. *Carvalho v. Toll Bros. and Developers, 143 N.J. 565, 572-73 (1996)*. Courts have traditionally held that imposing liability on accountants requires a privity or privity-like relationship between the claimant and the negligent actor. *Rosenblum, supra, 93 N.J. at 333 (citing Ultramares v. Touche, 174 N.E. 441 (N.Y. 1931))*. in *See also St. Paul Fire & Marine Ins. Co. v. Touche Ross & Co., 507 N.W.2d 275, 280 (Neb. 1993)*

## VI.    DEFENDANTS MERE REFERENCE TO 10 Del. C. Chapter 63

Defendants Mere Reference to Delaware 10, Chapter 63, which bears no case law, and states no where within it that because they are the only defendants in these proceedings that this absolves them of their TORTFEASOR and criminal activity brought against Plaintiffs Emerald Ridge Corporation and Cathy Brooks-McCollum. Plaintiffs are well aware of when and where a **JOINT TORTFEASOR** action can be brought, and has giving ample case, Federal and State law in support of such. These Defendants' believed that they will continually be protected by the courts, and believed that Plaintiff did not know why they were trying to invoke a JOINT TORTFEASOR clause to the settlement they were making, which would have left the Corporation wide open for abuse and financial difficulty, should these TORTFEASORS, then go back to the members of whom they convinced to commit the crimes on their behalf along with Attorney Kafader and request payment back for

5

the monies expended to them, now knowing that they were not and are not valid members, where the Corporation would not have privilege to the self dealing actions of these JOINT TORTFEASORS. Delaware 10, Chapter 63 does not make any mention of their having to be defendants in the same proceedings. Furthermore, the courts and all JOINT TORTFEASORS, have claimed on their on accord that they were subject to separate proceedings based on the jurisdiction of the other. Plaintiffs have disputed this theory based on number IV and V above, as well as in their Opening Brief.

These Defendants have done this on numerous occasions to their policyholders, after having placed them in such position.

## VII.    DEFENDANTS UNETHICAL BEHAVIOR IS IN SUCH ABUNDANCE THAT PLAINTIFFS HEREBY ATTACH AS EXHIBIT AR

Plaintiffs attach along with all the overwhelming evidence against these Defendant Tortfeasor EXHIBIT AR outlining just how far these defendants will go to deny a valid claim.

## VIII.    DEFENDANTS TORTFEASOR PARTNERS AGREEMENT THAT THEY WERE AND ARE ILLEGAL AND NOT INSURED PURSUANT THE STATE FARM POLICY

Defendants are incorrect in stating that Plaintiff did not have the authority to make any payments and have any repairs made. Defendants by their own admission in Exhibit K submitted by their attorney before the court. These Defendants through their counsel also admit that they were not properly elected and are therefore and were therefore not covered pursuant the State Farm Policy. Exhibit K clearly shows that all appointments began at the hands of Kenneth Shareef,, where Attorney Edward Kafader admitted through numerous filings that he could not act as a Board Member and/or be on the Board. Therefore, if not Plaintiff Brooks-McCollum not ensuring the protection of the Corporation who legally would be left to defend this corporation, since all other parties were brought off by Defendant State Farm in order to protect their bottom line.

## IX.    DEFENDANTS MERE BELIEF THAT THEY WOULD WEAR PLAINTIFF BROOKS-McCOLLUM DOWN AND THAT SHE WOULD ABANDON THE CLAIMS ON BEHALF OF HERSELF AND THAT OF THE CORPORATION AFTER HAVING BEEN VICTIMIZED AND CHASED FROM TEHIR HOME – AND FACED WITH BEING IN A FINANCIAL SITUATION WHICH 3X EXCEEDS THE SITUATION PLAINTIFF AND HER FAMILY WERE IN.

Defendants merely believed that their Strong Arm Tactics would wear Plaintiffs down, however, it is not fair to the Corporation and/or Plaintiffs to have been and continue to be placed in a position of burden at the hands of a party who was paid to protect the interest of the very parties defending actions before them.

6

It is further clear that Defendants are in violation of having cancelled the Insurance coverage by not submitting all of the renewal policies as par of discovery and are in violation per *"The liability of the insurance carrier with respect to the insurance required shall become absolute whenever injury or damage covered by policy occurs; said policy may not be cancelled or annulled as to such liability by an agreement between the insurance carrier and the insured after the occurrence of the injury or damage; no statement made by the insured or on his behalf and no violation of said policy shall defeat or void said policy."*

*Syl. Pt. 1, Charles v. State Farm Mutual Auto. Ins. Co. and State Farm Mutual Auto Ins. Co. v. Muncy, 192 W.Va. 293, 452 S.E.2d 384 (1994), quoting W.Va. Code 17D-4-12(g) [1991].*

The general rule is that a homeowner's liability insurance policy that covers loss from damages for negligent personal acts includes coverage for negligent entrustment absent any express exclusion to the contrary.

Syl. Pt. 1, *Huggins v. Tri-County Bonding Co. and Nationwide Ins. Co., 175 W.Va. 643, 337 S.E.2d 12 (1985).*

In Closing Plaintiff can merely state and hope that the Courts will adhere to all the rules setforth before it, because Defendants are hoping that the courts will not and all Plaintiffs can do is believe that all the harm brought upon the Corporation and Brooks-McCollum and her family in trying to adhere to the laws will not be for nothing and the courts will make the wrongs of these Defendants and their TORTFEASOR parties accountable for their actions. Plaintiffs would further ask and hope that the court will ensure that none of the costs assessed the Corporation remain borne the Corporation and the Court award the Corporation and Plaintiff full Compensation for the damages in which occurred as a result of these defendants actions. Plaintiff Brooks-McCollum incurred an addition $600,000 in expenses to obtain living arrangements comparable to those in which they lived, loss wages, legal fees and costs in excess of $40,000, the loss of their children being able to attend the school in which they were in and being placed in Public School as a means of the financial strain. Plaintiffs clearly stated in their Opening Brief all of the other damages incurred as a result of these Defendants wanting Plaintiffs to agree to terms of any settlement which left Plaintiffs open for Slander and Negligence. There never

was any settlement entertained, which would be deemed reasonable. Pursuant the courts ruling

governing Defendants negligence to supply and participate in discovery, Plaintiffs reserves the right to

include all items listed on Plaintiffs Exhibits in which they were not given access to.

8

E
X
H
I
B
I
T

A
R

STATE FARM MUTUAL AUTOMOBILE INSURANCE CO. v. CAMPBELL et al.

certiorari to the supreme court of utah

No. 01-1289. Argued December 11, 2002--Decided April 7, 2003

Although investigators and witnesses concluded that Curtis Campbell caused an accident in which one person was killed and another permanently disabled, his insurer, petitioner State Farm Mutual Automobile Insurance Company (State Farm), contested liability, declined to settle the ensuing claims for the $50,000 policy limit, ignored its own investigators' advice, and took the case to trial, assuring Campbell and his wife that they had no liability for the accident, that State Farm would represent their interests, and that they did not need separate counsel. In fact, a Utah jury returned a judgment for over three times the policy limit, and State Farm refused to appeal. The Utah Supreme Court denied Campbell's own appeal, and State Farm paid the entire judgment. The Campbells then sued State Farm for **bad faith**, **fraud**, and **intentional infliction of** *emotional distress*. The trial court's initial ruling granting State Farm summary judgment was reversed on appeal. On remand, the court denied State Farm's motion to exclude evidence of dissimilar out-of-state conduct. In the first phase of a bifurcated trial, the jury found unreasonable State Farm's decision not to settle. Before the second phase, this Court refused, in *BMW of North America, Inc. v. Gore, 517 U. S. 559*, to sustain a $2 million punitive damages award which accompanied a $4,000 compensatory damages award. The trial court **denied State Farm's renewed motion to exclude dissimilar out-of-state conduct evidence**. In the second phase, which addressed, inter alia, compensatory and punitive damages, evidence was introduced that pertained to State Farm's business practices in numerous States but bore no relation to the type of claims underlying the Campbells' complaint. **The jury awarded the Campbells $2.6 million in compensatory damages** and **$145 million in punitive damages**, which the trial court reduced to $1 million and $25 million respectively. Applying Gore, the Utah Supreme Court reinstated the $145 million punitive damages award.

Held: A punitive damages award of $145 million, where full compensatory damages are $1 million, is excessive and violates the Due Process Clause of the Fourteenth Amendment. Pp. 5-19.

(a) Compensatory damages are intended to redress a plaintiff's concrete loss, while punitive damages are aimed at the different purposes of deterrence and retribution. The Due Process Clause prohibits the imposition of grossly excessive or arbitrary punishments on a tort feaser. E.g., *Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U. S. 424, 433*. Punitive damages awards serve the same purpose as criminal penalties. However, because civil defendants are not accorded the protections afforded criminal defendants, punitive damages pose an acute danger of arbitrary deprivation of property, which is heightened when the decision maker is presented with evidence having little bearing on the amount that should be awarded. Thus, this Court has instructed courts reviewing punitive damages to consider (1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Gore, supra, at 575*. A trial court's application of these guideposts is subject to de novo review. *Cooper Industries, supra, at 424. Pp. 5-8*.

(b) Under Gore's guideposts, this case is neither close nor difficult. Pp. 8-18.

(1) To determine a defendant's reprehensibility--the most important indicium of a punitive damages award's reasonableness--a court must consider whether: the harm was physical rather than

economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the conduct involved repeated actions or was an isolated incident; and the harm resulted from intentional malice, trickery, or deceit, or mere accident. *Gore, 517 U. S., at 576-577*. It should be presumed that a plaintiff has been made whole by compensatory damages, so punitive damages should be awarded only if the defendant's culpability is so reprehensible to warrant the imposition of further sanctions to achieve punishment or deterrence. Id., at 575. In this case, State Farm's handling of the claims against the Campbells merits no praise, but a more modest punishment could have satisfied the State's legitimate objectives. **Instead, this case was used as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country.** However, a State cannot punish a defendant for conduct that may have been lawful where it occurred, id., at 572. Nor does the State have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of its jurisdiction. The Campbells argue that such evidence was used merely to demonstrate, generally, State Farm's motives against its insured. Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff. More fundamentally, in relying on such evidence, the Utah courts awarded punitive damages to punish and deter conduct that bore no relation to the Campbells' harm. Due process does not permit courts to adjudicate the merits of other parties' hypothetical claims under the guise of the reprehensibility analysis. Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct, for nonparties are not normally bound by another plaintiff's judgment. For the same reasons, the Utah Supreme Court's decision cannot be justified on the grounds that State Farm was a recidivist. To justify punishment based upon recidivism, courts must ensure the conduct in question replicates the prior transgressions. There is scant evidence of repeated misconduct of the sort that injured the Campbells, and a review of the decisions below does not convince this Court that State Farm was only punished for its actions toward the Campbells. Because the Campbells have shown no conduct similar to that which harmed them, the only relevant conduct to the reprehensibility analysis is that which harmed them. Pp. 8-14.

(2) With regard to the second Gore guidepost, the Court has been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award; but, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process. *See, e.g., Gore, supra, at 581*. Single-digit multipliers are more likely to comport with due process, while still achieving the State's deterrence and retribution goals, than are awards with 145-to-1 ratios, as in this case. Because there are no rigid benchmarks, ratios greater than those that this Court has previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages, Gore, supra, at 582, but when compensatory damages are substantial, then an even lesser ratio can reach the outermost limit of the due process guarantee. Here, there is a presumption against an award with a 145-to-1 ratio; the $1 million compensatory award for a year and a half of emotional distress was substantial; and the distress caused by outrage and humiliation the Campbells suffered is likely a component of both the compensatory and punitive damages awards. The Utah Supreme Court sought to justify the massive award based on premises bearing no relation to the award's reasonableness or proportionality to the harm. Pp. 14-18.

(3) The Court need not dwell on the third guidepost. The most relevant civil sanction under Utah state law for the wrong done to the Campbells appears to be a $10,000 fine for an act of grand fraud, which is dwarfed by the $145 million punitive damages award. The Utah Supreme Court's references to a broad fraudulent scheme drawn from out-of-state and dissimilar conduct evidence were insufficient to justify this amount. P. 18.

(c) Applying Gore's guideposts to the facts here, especially in light of the substantial compensatory damages award, likely would justify a punitive damages award at or near the compensatory damages amount. The Utah courts should resolve in the first instance the proper punitive damages calculation under the principles discussed here. Pp. 18-19.

___ P. 3d ___, reversed and remanded.

Kennedy, J., delivered the opinion of the Court, in which Rehnquist, C. J., and Stevens, O'Connor, Souter, and Breyer, JJ., joined. Scalia, J., Thomas, J., and Ginsburg, J., filed dissenting opinions.

---

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, PETITIONER v. INEZ PREECE CAMPBELL and MATTHEW C. BARNECK, special administrator and personal representative of the ESTATE OF CURTIS B. CAMPBELL

on writ of certiorari to the supreme court of utah

[April 7, 2003]

---

Justice Kennedy delivered the opinion of the Court.

We address once again the measure of punishment, by means of punitive damages, a State may impose upon a defendant in a civil case. The question is whether, in the circumstances we shall recount, an award of $145 million in punitive damages, where full compensatory damages are $1 million, is excessive and in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

**I**  In 1981, Curtis Campbell (Campbell) was driving with his wife, Inez Preece Campbell, in Cache County, Utah. He decided to pass six vans traveling ahead of them on a two-lane highway. Todd Ospital was driving a small car approaching from the opposite direction. To avoid a head-on collision with Campbell, who by then was driving on the wrong side of the highway and toward oncoming traffic, Ospital swerved onto the shoulder, lost control of his automobile, and collided with a vehicle driven by Robert G. Slusher. Ospital was killed, and Slusher was rendered permanently disabled. The Campbells escaped unscathed.

In the ensuing wrongful death and tort action, Campbell insisted he was not at fault. Early investigations did support differing conclusions as to who caused the accident, but "a consensus was reached early on by the investigators and witnesses that Mr. Campbell's unsafe pass had indeed caused the crash." ___ P. 3d ___, 2001 WL 1246676, *1 (Utah, Oct. 19, 2001). Campbell's insurance company, petitioner State Farm Mutual Automobile Insurance Company (State Farm), nonetheless decided to contest liability and declined offers by Slusher and Ospital's estate (Ospital) to settle the claims for the policy limit of $50,000 ($25,000 per claimant). State Farm also ignored the advice of one of its own investigators and took the case to trial, assuring the Campbells that "their assets were safe, that they had no liability for the accident, that [State Farm] would represent their interests, and that they did not need to procure separate counsel." Id., at ___, 2001 WL 1246676, at *2. To the contrary, a jury determined that Campbell was 100 percent at fault, and a judgment was returned for $185,849, far more than the amount offered in settlement.

At first State Farm refused to cover the $135,849 in excess liability. Its counsel made this clear to the Campbells: " 'You may want to put for sale signs on your property to get things moving.' " Ibid. Nor was State Farm willing to post a supersedeas bond to allow Campbell to appeal the judgment against him. Campbell obtained his own counsel to appeal the verdict. During the pendency of the appeal, in late 1984, Slusher, Ospital, and the Campbells reached an agreement whereby Slusher and Ospital agreed not to seek satisfaction of their claims against the Campbells. In exchange the Campbells agreed to pursue a bad faith action against State Farm and to be represented by Slusher's and Ospital's attorneys. The Campbells also agreed that Slusher and Ospital would have a right to play a part in all major decisions concerning the bad faith action. No settlement could be concluded without Slusher's and Ospital's approval, and Slusher and Ospital would receive 90 percent of any verdict against State Farm.

In 1989, the Utah Supreme Court denied Campbell's appeal in the wrongful death and tort actions. *Slusher v. Ospital, 777 P. 2d 437*. State Farm then paid the entire judgment, including the amounts in excess of the policy limits. The Campbells nonetheless filed a complaint against State Farm alleging bad faith, fraud, and intentional infliction of emotional distress. The trial court initially granted State Farm's motion for summary judgment because State Farm had paid the excess verdict, but that ruling was reversed on appeal. 840 P. 2d 130 (Utah App. 1992). On remand State Farm moved in limine to exclude evidence of alleged conduct that occurred in unrelated cases outside of Utah, but the trial court denied the motion. At State Farm's request the trial court bifurcated the trial into two phases conducted before different juries. In the first phase the jury determined that State Farm's decision not to settle was unreasonable because there was a substantial likelihood of an excess verdict.

Before the second phase of the action against State Farm we decided *BMW of North America, Inc. v. Gore, 517 U. S. 559 (1996)*, and refused to sustain a $2 million punitive damages award which accompanied a verdict of only $4,000 in compensatory damages. Based on that decision, State Farm again moved for the exclusion of evidence of dissimilar out-of-state conduct. App. to Pet. for Cert. 168a-172a. The trial court denied State Farm's motion. Id., at 189a.

The **second phase addressed State Farm's liability for fraud and intentional infliction of emotional distress, as well as compensatory and punitive damages**. The Utah Supreme Court aptly characterized this phase of the trial:

"State Farm argued during phase II that its decision to take the case to trial was an 'honest mistake' that did not warrant punitive damages. In contrast, the Campbells introduced evidence that State Farm's decision to take the case to trial was a result of a national scheme to meet corporate fiscal goals by capping payouts on claims company wide. This scheme was referred to as State Farm's 'Performance, Planning and Review,' or PP & R, policy. To prove the existence of this scheme, the trial court allowed the Campbells to introduce extensive expert testimony regarding fraudulent practices by State Farm in its nation-wide operations. Although State Farm moved prior to phase II of the trial for the exclusion of such evidence and continued to object to it at trial, the trial court ruled that such evidence was admissible to determine whether State Farm's conduct in the Campbell case was indeed intentional and sufficiently egregious to warrant punitive damages." ___ P. 3d, at ___, 2001 WL 1246676, at *3.

Evidence pertaining to the PP&R policy concerned State Farm's business practices for over 20 years in numerous States. Most of these practices bore no relation to third-party automobile insurance claims, the type of claim underlying the Campbells' complaint against the company. The jury awarded the Campbells $2.6 million in compensatory damages and $145 million in punitive damages, which the trial court reduced to $1 million and $25 million respectively. Both parties appealed.

The Utah Supreme Court sought to apply the three guideposts we identified in Gore, supra, at 574-575, and it reinstated the $145 million punitive damages award. Relying in large part on the extensive evidence concerning the PP&R policy, the court concluded State Farm's conduct was reprehensible. The court also relied upon State Farm's "massive wealth" and on testimony indicating that "State Farm's actions, because of their clandestine nature, will be punished at most in one out of every 50,000 cases as a matter of statistical probability," ___ P. 3d, at ___, 2001 WL 1246676, at *15, and concluded that the ratio between punitive and compensatory damages was not unwarranted. Finally, the court noted that the punitive damages award was not excessive when compared to various civil and criminal penalties State Farm could have faced, including $10,000 for each act of fraud, the suspension of its license to conduct business in Utah, the disgorgement of profits, and imprisonment. Id., at ___, 2001 WL 1246676, at *17. We granted certiorari. 535 U. S. 1111 (2002).

**II**    We recognized in _Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U. S. 424 (2001)_, that in our judicial system compensatory and punitive damages, although usually awarded at the same time by the same decision maker, serve different purposes. Id., at 432. Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." Ibid. (citing Restatement (Second) of Torts §903, pp. 453-454 (1979)). By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution. Cooper Industries, supra, at 432; see also Gore, supra, at 568 ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition"); _Pacific Mut. Life Ins. Co. v. Haslip, 499 U. S. 1, 19 (1991)_ ("[P]unitive damages are imposed for purposes of retribution and deterrence").

While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards. _Cooper Industries, supra; Gore, 517 U. S., at 559; Honda Motor Co. v. Oberg, 512 U. S. 415 (1994); TXO Production Corp. v. Alliance Resources Corp., 509 U. S. 443 (1993);_ Haslip, supra. The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. _Cooper Industries, supra, at 433; Gore, 517 U. S., at 562; see also id., at 587 (Breyer, J., concurring)_ ("This constitutional concern, itself harkening back to the Magna Carta, arises out of the basic unfairness of depriving citizens of life, liberty, or property, through the application, not of law and legal processes, but of arbitrary coercion"). The reason is that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." Id., at 574; Cooper Industries, supra, at 433 ("Despite the broad discretion that States possess with respect to the imposition of criminal penalties and punitive damages, the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes substantive limits on that discretion"). To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property. Haslip, supra, at 42 (O'Connor, J., dissenting) ("Punitive damages are a powerful weapon. Imposed wisely and with restraint, they have the potential to advance legitimate state interests. Imposed indiscriminately, however, they have a devastating potential for harm. Regrettably, common-law procedures for awarding punitive damages fall into the latter category").

Although these awards serve the same purposes as criminal penalties, defendants subjected to punitive damages in civil cases have not been accorded the protections applicable in a criminal proceeding. This increases our concerns over the imprecise manner in which punitive damages systems are administered. We have admonished that "[p]unitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing

amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences." Honda Motor, supra, at 432; see also Haslip, supra, at 59 (O'Connor, J., dissenting) ("[T]he Due Process Clause does not permit a State to classify arbitrariness as a virtue. Indeed, the point of due process--of the law in general--is to allow citizens to order their behavior. A State can have no legitimate interest in deliberately making the law so arbitrary that citizens will be unable to avoid punishment based solely upon bias or whim"). Our concerns are heightened when the decision maker is presented, as we shall discuss, with evidence that has little bearing as to the amount of punitive damages that should be awarded. Vague instructions, or those that merely inform the jury to avoid "passion or prejudice," App. to Pet. for Cert. 108a-109a, do little to aid the decision maker in its task of assigning appropriate weight to evidence that is relevant and evidence that is tangential or only inflammatory.

In light of these concerns, in Gore, supra, we instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Id., at 575. We reiterated the importance of these three guideposts in Cooper Industries and mandated appellate courts to conduct de novo review of a trial court's application of them to the jury's award. 532 U. S., at 424. Exacting appellate review ensures that an award of punitive damages is based upon an " 'application of law, rather than a decision maker's caprice.' " Id., at 436 (quoting Gore, supra, at 587 (Breyer, J., concurring)).

**III**    Under the principles outlined in *BMW of North America, Inc. v. Gore*, this case is neither close nor difficult. It was error to reinstate the jury's $145 million punitive damages award. We address each guidepost of Gore in some detail.

**A**    "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, supra, at 575. We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct **involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident**. 517 U. S., at 576-577. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. Id., at 575.

Applying these factors in the instant case, we must acknowledge that State Farm's handling of the claims against the Campbells merits no praise. The trial court found that State Farm's employees altered the company's records to make Campbell appear less culpable. State Farm disregarded the overwhelming likelihood of liability and the near-certain probability that, by taking the case to trial, a judgment in excess of the policy limits would be awarded. State Farm amplified the harm by at first assuring the Campbells their assets would be safe from any verdict and by later telling them, post judgment, to put a for-sale sign on their house. While we do not suggest there was error in awarding punitive damages based upon State Farm's conduct toward the Campbells, a more modest punishment for this reprehensible conduct could have satisfied the State's legitimate objectives, and the Utah courts should have gone no further.

This case, instead, was used as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country. The Utah Supreme Court's opinion makes explicit that State Farm was being condemned for its nationwide policies rather than for the conduct direct toward the Campbells. ___ P. 3d, at ___, 2001 WL 1246676, at *3 ("[T]he Campbells introduced evidence that State Farm's decision to take the case to trial was a result of a national scheme to meet corporate fiscal goals by capping payouts on claims company wide"). This was, as well, an explicit rationale of the trial court's decision in approving the award, though reduced from $145 million to $25 million. App. to Pet. for Cert. 120a ("[T]he Campbells demonstrated, through the testimony of State Farm employees who had worked outside of Utah, and through expert testimony, that this pattern of claims adjustment under the PP&R program was not a local anomaly, but was a consistent, nationwide feature of State Farm's business operations, orchestrated from the highest levels of corporate management").

The Campbells contend that State Farm has only itself to blame for the reliance upon dissimilar and out-of-state conduct evidence. The record does not support this contention. From their opening statements onward the Campbells framed this case as a chance to rebuke State Farm for its nationwide activities. App. 208 ("You're going to hear evidence that even the insurance commission in Utah and around the country are unwilling or inept at protecting people against abuses"); id., at 242 ("[T]his is a very important case. . . . [I]t transcends the Campbell file. It involves a nationwide practice. And you, here, are going to be evaluating and assessing, and hopefully requiring State Farm to stand accountable for what it's doing across the country, which is the purpose of punitive damages"). This was a position maintained throughout the litigation. In opposing State Farm's motion to exclude such evidence under Gore, the Campbells' counsel convinced the trial court that there was no limitation on the scope of evidence that could be considered under our precedents. App. to Pet. for Cert. 172a ("As I read the case [Gore], I was struck with the fact that a clear message in the case ... seems to be that courts in punitive damages cases should receive more evidence, not less. And that the court seems to be inviting an even broader area of evidence than the current rulings of the court would indicate"); id., at 189a (trial court ruling).

A State cannot punish a defendant for conduct that may have been lawful where it occurred. Gore, supra, at 572; *Bigelow v. Virginia, 421 U. S. 809, 824 (1975)* ("A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State"); *New York Life Ins. Co. v. Head, 234 U. S. 149, 161 (1914)* ("[I]t would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State . . . without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends. This is so obviously the necessary result of the Constitution that it has rarely been called in question and hence authorities directly dealing with it do not abound"); *Huntington v. Attrill, 146 U. S. 657, 669 (1892)* ("Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of other States"). Nor, as a general rule, does a State have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction. Any proper adjudication of conduct that occurred outside Utah to other persons would require their inclusion, and, to those parties, the Utah courts, in the usual case, would need to apply the laws of their relevant jurisdiction. *Phillips Petroleum Co. v. Shutts, 472 U. S. 797, 821-822 (1985)*.

Here, the Campbells do not dispute that much of the out-of-state conduct was lawful where it occurred. They argue, however, that such evidence was not the primary basis for the punitive damages award and was relevant to the extent it demonstrated, in a general sense, State Farm's motive against its

insured. Brief for Respondents 46-47 ("[E]ven if the practices described by State Farm were not malum in se or malum prohibitum, they became relevant to punitive damages to the extent they were used as tools to implement State Farm's wrongful PP&R policy"). This argument misses the mark. Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff. A jury must be instructed, furthermore, that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred. Gore, 517 U. S., at 572-573 (noting that a State "does not have the power ... to punish [a defendant] for conduct that was lawful where it occurred and that had no impact on [the State] or its residents"). A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction. Id., at 569 ("[T]he States need not, and in fact do not, provide such protection in a uniform manner").

For a more fundamental reason, however, the Utah courts erred in relying upon this and other evidence: The courts awarded punitive damages to punish and deter conduct that bore no relation to the Campbells' harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis, but we have no doubt the Utah Supreme Court did that here. __ P. 3d, at __, 2001 WL 1246676, at *11 ("Even if the harm to the Campbells can be appropriately characterized as minimal, the trial court's assessment of the situation is on target: 'The harm is minor to the individual but massive in the aggregate' "). Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains. Gore, supra, at 593 (Breyer, J., concurring) ("Larger damages might also 'double count' by including in the punitive damages award some of the compensatory, or punitive, damages that subsequent plaintiffs would also recover").

The same reasons lead us to conclude the Utah Supreme Court's decision cannot be justified on the grounds that State Farm was a recidivist. Although "[o]ur holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance," Gore, supra, at 577, in the context of civil actions courts must ensure the conduct in question replicates the prior transgressions. TXO, 509 U. S., at 462, n. 28 (noting that courts should look to " 'the existence and frequency of similar past conduct' ") (quoting Haslip, 499 U. S., at 21-2).

The Campbells have identified scant evidence of repeated misconduct of the sort that injured them. Nor does our review of the Utah courts' decisions convince us that State Farm was only punished for its actions toward the Campbells. Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length. Other evidence concerning reprehensibility was even more tangential. For example, the Utah Supreme Court criticized State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees. ___ P. 3d, at ___, 2001 WL 1246676, at *10; id., at ___, 2001 WL 1246676, at *12. The Campbells attempt to justify the courts' reliance upon this unrelated testimony on the theory that each dollar of profit made by underpaying a third-party claimant is the same

as a dollar made by underpaying a first-party one. Brief for Respondents 45; see also ___ P. 3d, at ___, 2001 WL 1246676, at *12 ("State Farm's continuing illicit practice created market disadvantages for other honest insurance companies because these practices increased profits. As plaintiffs' expert witnesses established, such wrongfully obtained competitive advantages have the potential to pressure other companies to adopt similar fraudulent tactics, or to force them out of business. Thus, such actions cause distortions throughout the insurance market and ultimately hurt all consumers"). For the reasons already stated, this argument is unconvincing. The reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance, which in this case extended for a 20-year period. In this case, because the Campbells have shown no conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis.

**B** ·  Turning to the second Gore guidepost, we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. Gore, supra, at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award"); TXO, supra, at 458. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In Haslip, in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 U. S., at 23-24. We cited that 4-to-1 ratio again in Gore. 517 U. S., at 581. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. Id., at 581, and n. 33. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, id., at 582, or, in this case, of 145 to 1.

Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages." Ibid.; see also ibid. (positing that a higher ratio might be necessary where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine"). The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered. In the context of this case, we have no doubt that there is a presumption against an award that has a 145-to-1 ratio. The compensatory award in this case was substantial; the Campbells were awarded $1 million for a year and a half of emotional distress. This was complete compensation. The harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries; and State Farm paid the excess verdict before the complaint was filed, so the Campbells suffered only minor economic injuries for the 18-month period in which State Farm refused to resolve the claim against them. The compensatory damages for the injury suffered here, moreover, likely were based on a component which was duplicated in the punitive award. Much of the distress was caused by the outrage and humiliation the Campbells suffered at the actions of their insurer; and it is a major role of punitive damages to

condemn such conduct. Compensatory damages, however, already contain this punitive element. See Restatement (Second) of Torts §908, Comment c, p. 466 (1977) ("In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both").

The Utah Supreme Court sought to justify the massive award by pointing to State Farm's purported failure to report a prior $100 million punitive damages award in Texas to its corporate headquarters; the fact that State Farm's policies have affected numerous Utah consumers; the fact that State Farm will only be punished in one out of every 50,000 cases as a matter of statistical probability; and State Farm's enormous wealth. ____ P. 3d, at ____, 2001 WL 1246676, at *15. Since the Supreme Court of Utah discussed the Texas award when applying the ratio guidepost, we discuss it here. The Texas award, however, should have been analyzed in the context of the reprehensibility guidepost only. The failure of the company to report the Texas award is out-of-state conduct that, if the conduct were similar, might have had some bearing on the degree of reprehensibility, subject to the limitations we have described. Here, it was dissimilar, and of such marginal relevance that it should have been accorded little or no weight. The award was rendered in a first-party lawsuit; no judgment was entered in the case; and it was later settled for a fraction of the verdict. With respect to the Utah Supreme Court's second justification, the Campbells' inability to direct us to testimony demonstrating harm to the people of Utah (other than those directly involved in this case) indicates that the adverse effect on the State's general population was in fact minor.

The remaining premises for the Utah Supreme Court's decision bear no relation to the award's reasonableness or proportionality to the harm. They are, rather, arguments that seek to defend a departure from well-established constraints on punitive damages. While States enjoy considerable discretion in deducing when punitive damages are warranted, each award must comport with the principles set forth in Gore. Here the argument that State Farm will be punished in only the rare case, coupled with reference to its assets (which, of course, are what other insured parties in Utah and other States must rely upon for payment of claims) had little to do with the actual harm sustained by the Campbells. The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award. Gore, 517 U. S., at 585 ("The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business"); see also id., at 591 (Breyer, J., concurring) ("[Wealth] provides an open-ended basis for inflating awards when the defendant is wealthy ... . That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct"). The principles set forth in Gore must be implemented with care, to ensure both reasonableness and proportionality.

C    The third guidepost in Gore is the disparity between the punitive damages award and the "civil penalties authorized or imposed in comparable cases." Id., at 575. We note that, in the past, we have also looked to criminal penalties that could be imposed. Id., at 583; Haslip, 499 U. S., at 23. The existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award.

Here, we need not dwell long on this guidepost. The most relevant civil sanction under Utah state law for the wrong done to the Campbells appears to be a $10,000 fine for an act of fraud, ___ P. 3d, at ___, 2001 WL 1246676, at *17, an amount dwarfed by the $145 million punitive damages award. The Supreme Court of Utah speculated about the loss of State Farm's business license, the disgorgement of profits, and possible imprisonment, but here again its references were to the broad fraudulent scheme drawn from evidence of out-of-state and dissimilar conduct. This analysis was insufficient to justify the award.

**IV**    An application of the Gore guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages. The punitive award of $145 million, therefore, was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant. The proper calculation of punitive damages under the principles we have discussed should be resolved, in the first instance, by the Utah courts.

The judgment of the Utah Supreme Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

It is so ordered.

---

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY, PETITIONER v. INEZ PREECE CAMPBELL and MATTHEW C. BARNECK, special
administrator and personal representative of the ESTATE OF CURTIS B. CAMPBELL

on writ of certiorari to the supreme court of utah

[April 7, 2003]

---

Justice Scalia, dissenting.

I adhere to the view expressed in my dissenting opinion in *BMW of North America, Inc. v. Gore, 517 U. S. 559, 598-99 (1996)*, that the Due Process Clause pro-vides no substantive protections against "excessive" or " 'unreasonable' " awards of punitive damages. I am also of the view that the punitive damages jurisprudence which has sprung forth from *BMW v. Gore* is insusceptible of principled application; accordingly, I do not feel justified in giving the case stare decisis effect. See id., at 599. I would affirm the judgment of the Utah Supreme Court.

---

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY, PETITIONER v. INEZ PREECE CAMPBELL and MATTHEW C. BARNECK, special
administrator and personal representative of the ESTATE OF CURTIS B. CAMPBELL

on writ of certiorari to the supreme court of utah

[April 7, 2003]

---------------------------------------------------------------------------------

Justice Thomas, dissenting.

I would affirm the judgment below because "I continue to believe that the Constitution does not constrain the size of punitive damages awards." *Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U. S. 424, 443 (2001) (Thomas, J., concurring) (citing BMW of North America, Inc. v. Gore, 517 U. S. 559, 599 (1996)* (Scalia, J., joined by Thomas, J., dissenting)). Accordingly, I respectfully dissent.

---

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY, PETITIONER v. INEZ PREECE CAMPBELL and MATTHEW C. BARNECK, special administrator and personal representative of the ESTATE OF CURTIS B. CAMPBELL

on writ of certiorari to the supreme court of utah

[April 7, 2003]

---

Justice Ginsburg, dissenting.

Not long ago, this Court was hesitant to impose a federal check on state-court judgments awarding punitive damages. In *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U. S. 257 (1989)*, the Court held that neither the Excessive Fines Clause of the Eighth Amendment nor federal common law circumscribed awards of punitive damages in civil cases between private parties. *Id., at 262-276, 277-280*. Two years later, in *Pacific Mut. Life Ins. Co. v. Haslip, 499 U. S. 1 (1991), the Court observed that "unlimited jury [or judicial] discretion ... in the fixing of punitive damages may invite extreme results* that jar one's constitutional sensibilities," id., at 18; the Due Process Clause, the Court suggested, would attend to those sensibilities and guard against unreasonable awards, id., at 17-24. Nevertheless, the Court upheld a punitive damages award in Haslip "more than 4 times the amount of compensatory damages, ... more than 200 times [the plaintiff's] out-of-pocket expenses," and "much in excess of the fine that could be imposed." Id., at 23. And in *TXO Production Corp. v. Alliance Resources Corp., 509 U. S. 443 (1993)*, the Court affirmed a state-court award "526 times greater than the actual damages awarded by the jury." Id., at 453;1 cf. Browning-Ferris, 492 U. S., at 262 (ratio of punitive to compensatory damages over 100 to 1).

It was not until 1996, in *BMW of North America, Inc. v. Gore, 517 U. S. 559 (1996)*, that the Court, for the first time, invalidated a state-court punitive damages assessment as unreasonably large. See id., at 599 (Scalia, J., dissenting). If our activity in this domain is now "well-established," see ante, at 5, 17, it takes place on ground not long held.

In Gore, I stated why I resisted the Court's foray into punitive damages "territory traditionally within the States' domain." *517 U. S., at 612 (dissenting opinion)*. I adhere to those views, and note again that, unlike federal habeas corpus review of state-court convictions under 28 U. S. C. §2254, the Court "work[s] at this business [of checking state courts] alone," unaided by the participation of federal district courts and courts of appeals. 517 U. S., at 613. It was once recognized that "the laws of the particular State must suffice [to superintend punitive damages awards] until judges or legislators authorized to do so initiate system-wide change." Haslip, 499 U. S., at 42 (Kennedy, J., concurring in judgment). I would adhere to that traditional view.

I   The large size of the award upheld by the Utah Supreme Court in this case indicates why damage-capping legislation may be altogether fitting and proper. Neither the amount of the award nor the trial record, however, justifies this Court's substitution of its judgment for that of Utah's competent decisionmakers. In this regard, I count it significant that, on the key criterion "reprehensibility," there is a good deal more to the story than the Court's abbreviated account tells.

Ample evidence allowed the jury to find that State Farm's treatment of the Campbells typified its "Performance, Planning and Review" (PP&R) program; implemented by top management in 1979, the program had "the explicit objective of using the claims-adjustment process as a profit center." App. to Pet. for Cert. 116a. "[T]he Campbells presented considerable evidence," the trial court noted, documenting "that the PP&R program ... has functioned, and continues to function, as an unlawful scheme ... to deny benefits owed consumers by paying out less than fair value in order to meet preset, arbitrary payout targets designed to enhance corporate profits." Id., at 118a-119a. That policy, the trial court observed, was encompassing in scope; it "applied equally to the handling of both third-party and first-party claims." Id., at 119a. But cf. ante, at 13, 17 (suggesting that State Farm's handling of first-party claims has "nothing to do with a third-party lawsuit").

Evidence the jury could credit demonstrated that the PP&R program regularly and adversely affected Utah residents. Ray Summers, "the adjuster who handled the Campbell case and who was a State Farm employee in Utah for almost twenty years," described several methods used by State Farm to deny claimants fair benefits, for example, "falsifying or withholding of evidence in claim files." Id., at 121a. A common tactic, Summers recounted, was to "unjustly attac[k] the character, reputation and credibility of a claimant and mak[e] notations to that effect in the claim file to create prejudice in the event the claim ever came before a jury." Id., at 130a (internal quotation marks omitted). State Farm manager Bob Noxon, Summers testified, resorted to a tactic of this order in the Campbell case when he "instruct[ed] Summers to write in the file that Todd Ospital (who was killed in the accident) was speeding because he was on his way to see a pregnant girlfriend." Ibid. In truth, "[t]here was no pregnant girlfriend." Ibid. Expert testimony noted by the trial court described these tactics as "completely improper." Ibid.

The trial court also noted the testimony of two Utah State Farm employees, Felix Jensen and Samantha Bird, both of whom recalled "intolerable" and "recurrent" pressure to reduce payouts below fair value. Id., at 119a (internal quotation marks omitted). When Jensen complained to top managers, he was told to "get out of the kitchen" if he could not take the heat; Bird was told she should be "more of a team player." Ibid. (internal quotation marks omitted). At times, Bird said, she "was forced to commit dishonest acts and to knowingly underpay claims." Id., at 120a. Eventually, Bird quit. Ibid. Utah managers superior to Bird, the evidence indicated, were improperly influenced by the PP&R program to encourage insurance underpayments. For example, several documents evaluating the performance of managers Noxon and Brown "contained explicit preset average payout goals." Ibid.

Regarding liability for verdicts in excess of policy limits, the trial court referred to a State Farm document titled the "Excess Liability Handbook"; written before the Campbell accident, the handbook instructed adjusters to pad files with "self-serving" documents, and to leave critical items out of files, for example, evaluations of the insured's exposure. Id., at 127a-128a (internal quotation marks omitted). Divisional superintendent Bill Brown used the handbook to train Utah employees. Id., at 134a. While overseeing the Campbell case, Brown ordered adjuster Summers to change the portions of his report indicating that Mr. Campbell was likely at fault and that the settlement cost was correspondingly high. Id., at 3a. The Campbells' case, according to expert testimony the trial court recited, "was a classic example of State Farm's application of the improper practices taught in the Excess Liability Handbook." Id., at 128a.

The trial court further determined that the jury could find State Farm's policy **"deliberately crafted"** to prey on consumers who would be unlikely to defend themselves. Id., at 122a. In this regard, the trial court noted the testimony of several former State Farm employees affirming that they were trained to target "the weakest of the herd"--**"the elderly, the poor,** and **other consumers who are least knowledgeable about their rights and thus most vulnerable to trickery or deceit,** or who have little money and hence have no real alternative but to accept an inadequate offer to settle a claim at much less than fair value." Ibid. (internal quotation marks omitted).

The Campbells themselves could be placed within the "weakest of the herd" category. The couple appeared economically vulnerable and emotionally fragile. App. 3360a-3361a (Order Denying State Farm's Motion for Judgment NOV and New Trial Regarding Intentional Infliction of Emotional Distress). At the time of State Farm's wrongful conduct, "Mr. Campbell had residuary effects from a stroke and Parkinson's disease." Id., at 3360a.

To further insulate itself from liability, trial evidence indicated, State Farm made **"systematic" efforts to destroy internal company documents that might reveal its scheme, App. to Pet. for Cert. 123a,** efforts that directly affected the Campbells, id., at 124a. For example, State Farm had "a special historical department that contained a copy of all past manuals on claim-handling practices and the dates on which each section of each manual was changed." Ibid. Yet in discovery proceedings, State Farm failed to produce any claim-handling practice manuals for the years relevant to the Campbells' bad-faith case. Id., at 124a-
125a.

State Farm's inability to produce the manuals, it appeared from the evidence, was not accidental. Documents retained by former State Farm employee Samantha Bird, as well as Bird's testimony, showed that while the Campbells' case was pending, Janet Cammack, "an in-house attorney sent by top State Farm management, conducted a meeting ... in Utah during which she instructed Utah claims management to search their offices and destroy a wide range of material of the sort that had proved damaging in bad-faith litigation in the past--in particular, old claim-handling manuals, memos, claim school notes, procedure guides and other similar documents." Id., at 125a. "These orders were followed even though at least one meeting participant, Paul Short, was personally aware that these kinds of materials had been requested by the Campbells in this very case." Ibid.

Consistent with Bird's testimony, **State Farm admitted that it destroyed every single copy of claim-handling manuals on file in its historical department as of 1988, even though these documents could have been preserved at minimal expense. Ibid. Fortuitously, the Campbells obtained a copy of the 1979 PP&R manual by subpoena from a former employee. Id., at 132a. Although that manual has been requested in other cases, State Farm has never itself produced the document. Ibid.**

"As a final, related tactic," the trial court stated, the jury could reasonably find that "in recent years State Farm has gone to extraordinary lengths to stop damaging documents from being created in the first place." Id., at 126a. State Farm kept no records at all on excess verdicts in third-party cases, or on bad-faith claims or attendant verdicts. Ibid. State Farm alleged "that it has no record of its punitive damage payments, even though such payments must be reported to the [Internal Revenue Service] and in some states may not be used to justify rate increases." Ibid. Regional Vice President Buck Moskalski testified that "he would not report a punitive damage verdict in [the Campbells'] case to higher management, as such reporting was not set out as part of State Farm's management practices." Ibid.

State Farm's "wrongful profit and evasion schemes," the trial court underscored, were directly relevant to the Campbells' case, id., at 132a:

"The record fully supports the conclusion that the bad-faith claim handling that exposed the Campbells to an excess verdict in 1983, and resulted in severe damages to them, was a product of the **unlawful profit scheme that had been put in place by top management at State Farm years earlier**. The Campbells presented substantial evidence showing how State Farm's improper insistence on claims-handling employees' reducing their claim payouts ... regardless of the merits of each claim, manifested itself ... in the Utah claims operations during the period when the decisions were made not to offer to settle the Campbell case for the $50,000 policy limits--indeed, not to make any offer to settle at a lower amount. This evidence established that high-level manager **Bill Brown was under heavy pressure from the PP&R scheme to control indemnity payouts during the time period in question**. In particular, when Brown declined to pay the excess verdict against Curtis Campbell, or even post a bond, he had a special need to keep his year-end numbers down, since the State Farm incentive scheme meant that keeping those numbers down was important to helping Brown get a much-desired transfer to Colorado... . There was ample evidence that the concepts taught in the Excess Liability Handbook, including the dishonest alteration and manipulation of claim files and the policy against posting any supersedeas bond for the full amount of an excess verdict, were dutifully carried out in this case... . There was ample basis for the jury to find that everything that had happened to the Campbells--when State Farm repeatedly refused in bad-faith to settle for the $50,000 policy limits and went to trial, and then failed to pay the 'excess' verdict, or at least post a bond, after trial--was a direct application of State Farm's overall profit scheme, operating through Brown and others." Id., at 133a-134a.

State Farm's "policies and practices," the trial evidence thus bore out, were "responsible for the injuries suffered by the Campbells," and the means used to implement those policies could be found "callous, clandestine, fraudulent, and dishonest." Id., at 136a; see id., at 113a (finding "ample evidence" that State Farm's reprehensible corporate policies were responsible for injuring "many other Utah consumers during the past two decades"). The Utah Supreme Court, relying on the trial court's record-based recitations, understandably characterized State Farm's behavior as "egregious and malicious." Id., at 18a.

**II**    The Court dismisses the evidence describing and documenting State Farm's PP&R policy and practices as essentially irrelevant, bearing "no relation to the Campbells' harm." Ante, at 12; see ante, at 14 ("conduct that harmed [the Campbells] is the only conduct relevant to the reprehensibility analysis"). It is hardly apparent why that should be so. What is infirm about the Campbells' theory that their experience with State Farm exemplifies and reflects an overarching underpayment scheme, one that caused "repeated misconduct of the sort that injured them," ante, at 13? The Court's silence on that score is revealing: Once one recognizes that the Campbells did show "conduct by State Farm similar to that which harmed them," ante, at 14, it becomes impossible to shrink the reprehensibility analysis to this sole case, or to maintain, at odds with the determination of the trial court, see App. to Pet. for Cert. 113a, that "the adverse effect on the State's general population was in fact minor," ante, at 17.

Evidence of out-of-state conduct, the Court acknowledges, may be "probative [even if the conduct is lawful in the state where it occurred] when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious... ." Ante, at 11; cf. ante, at 8 (reiterating this Court's instruction that trial courts assess whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident"). "Other acts" evidence concerning practices both in and out of State was introduced in this case to show just such "deliberateness" and "culpability." The evidence was

admissible, the trial court ruled: (1) to document State Farm's "reprehensible" PP&R program; and (2) to "rebut [State Farm's] assertion that [its] actions toward the Campbells were inadvertent errors or mistakes in judgment." App. 3329a (Order Denying Various Motions of State Farm to Exclude Plaintiffs' Evidence). Viewed in this light, there surely was "a nexus" between much of the "other acts" evidence and "the specific harm suffered by [the Campbells]." Ante, at 11.

**III** When the Court first ventured to override state-court punitive damages awards, it did so moderately. The Court recalled that "[i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." Gore, 517 U. S., at 568. Today's decision exhibits no such respect and restraint. No longer content to accord state-court judgments "a strong presumption of validity," TXO, 509 U. S., at 457, the Court announces that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Ante, at 14.2 Moreover, the Court adds, when compensatory damages are substantial, doubling those damages "can reach the outermost limit of the due process guarantee." Ante, at 15; see ante, at 18-19 ("facts of this case ... likely would justify a punitive damages award at or near the amount of compensatory damages"). In a legislative scheme or a state high court's design to cap punitive damages, the handiwork in setting single-digit and 1-to-1 benchmarks could hardly be questioned; in a judicial decree imposed on the States by this Court under the banner of substantive due process, the numerical controls today's decision installs seem to me boldly out of order.

* * *

I remain of the view that this Court has no warrant to reform state law governing awards of punitive damages. Gore, 517 U. S., at 607 (Ginsburg, J., dissenting). Even if I were prepared to accept the flexible guides prescribed in Gore, I would not join the Court's swift conversion of those guides into instructions that begin to resemble marching orders. For the reasons stated, I would leave the judgment of the Utah Supreme Court undisturbed.

FOOTNOTES

Footnote 1

By switching the focus from the ratio of punitive to compensatory damages to the potential loss to the plaintiffs had the defendant succeeded in its illicit scheme, the Court could describe the relevant ratio in TXO as 10 to 1. See BMW of North America, Inc. v. Gore, 517 U. S. 559, 581, and n. 34 (1996).

Footnote 2

*TXO Production Corp. v. Alliance Resources Corp., 509 U. S. 443, 462, n. 8 (1993)*, noted that "[u]nder well-settled law," a defendant's "wrongdoing in other parts of the country" and its "impressive net worth" are factors "typically considered in assessing punitive damages." It remains to be seen whether, or the extent to which, today's decision will unsettle that law.

Filed June 10, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
Nos. 96-7073, 96-7102

MARK KLINGER,
Appellant in 96-7073

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,*

Cross-Appellant in 96-7102

(*Amended by 2/20/96 Order)

(D.C. No. 94-cv-01393)

Nos. 96-7074, 96-7101
LINDA NEYER,

Appellant in 96-7074

v.

STATE FARM MUTUAL AUTOMOBILE

INSURANCE COMPANY,

Cross-Appellant in 96-7101

(D.C. No. 94-cv-01469)

ON APPEAL FROM THE

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---------------------------------------------------------------------------------
Argued: January 23, 1997

Before: NYGAARD and LEWIS, Circuit Judges , and

COHILL, Senior District Judge .*

(Opinion filed June 10, 1997)

DAVID L. LUTZ, ESQUIRE

RICHARD C. ANGINO, ESQUIRE

(Argued)

Angino & Rovner

4503 North Front Street

Harrisburg, PA 17110

Attorneys for Appellants/

Cross-Appellees

ROBERT E. KELLY, JR., ESQUIRE

(Argued)

Duane, Morris & Heckscher

305 North Front Street

P.O. Box 1003

Harrisburg, PA 17108-1003

Attorney for Appellee/

Cross-Appellant

OPINION OF THE COURT

NYGAARD, Circuit Judge .

Mark Klinger and Linda Neyer appeal from the decision of the district court denying them costs, attorney's fees and the full amount of pre-judgment interest they sought in their otherwise successful bad faith action against State Farm Mutual Automobile Insurance Company. We conclude that the district court erred only in one aspect--the reasons

---

*Honorable Maurice B. Cohill, Jr., United States District Court for the Western District of Pennsylvania, sitting by designation.

**2** it gave for denying the request for attorney's fees--but that its error was in its explanation, not in its application of legal precepts and does not affect the amount to which appellants are entitled. We will therefore affirm.

I. A.

In August 1992, Klinger and Neyer were seriously injured in a head-on collision while riding in Klinger's van, which was one of two vehicles owned by him and insured by State Farm. The other driver's insurance was inadequate to compensate them or their injuries, so Klinger and Neyer filed underinsured motorist claims against the two State Farm policies. State Farm disputed the amount of coverage available under these insurance policies, and the parties agreed to bifurcate the issues of coverage and damages and to arbitrate them separately.1 Attorney Richard Wix represented State Farm. Attorney David L. Lutz represented Klinger and Neyer.

In October 1993, the arbitrators determined that the coverage available under Klinger's two policies was $115,000. That established, in November, Attorney Lutz sent two letters to Wix demanding that State Farm tender the policy limits to his clients. Wix, however, never apprised State Farm of either of these letters. State Farm contends that it did not know the results of the arbitration because its attorney, Wix, did not answer his phone calls. A State Farm claims representative, however, did not personally visit Wix's office until March 1994. Nonetheless, in January 1994, Attorney Lutz told Timothy Spader, a State Farm claims representative, the results of the arbitration and of his demand letters, when Spader happened to be talking to Lutz about another matter.

---

1. In April 1993, before the coverage arbitration was held, State Farm offered each plaintiff $15,000, an amount representing the policy limits as State Farm interpreted them. This offer was refused.

**3** Spader then contacted Attorney Wix, who promised him a letter documenting the status of the case. After receiving nothing, Spader finally visited Wix's office personally in March 1994 and obtained some medical records and documentary data. Only then did Spader contact Attorney Lutz, who had earlier written that he was considering a bad faith claim and stated that he would provide State Farm with whatever information it needed to evaluate the extent of damages.

Still State Farm did nothing. In March 1994, the arbitrators scheduled the damages arbitration for June 28. Again Lutz demanded that State Farm pay the policy limits. Again, State Farm's attorney apparently failed to forward this request to State Farm. In April, Lutz went around State Farm's attorney, writing directly to Spader, and inquired whether State Farm was interested in settling the case. Still State Farm offered its insureds nothing.

In June, although the hearing was scheduled for less than a week later, and even though Wix himself now recommended that State Farm tender them the policy limits, State Farm made no offer to pay the appellants anything. Instead, State Farm sought a stay of the hearing.

Attorney Lutz refused, and they arbitrated damages. The arbitrators awarded $115,000 to Klinger and $70,000 to Neyer. Finally, on August 2, 1994, a full two years after the accident, and months after State Farm had all the information necessary to evaluate Klinger and Neyer's claims, State Farm paid them.

**B.** Klinger and Neyer filed suit in the Dauphin County Court of Common Pleas, alleging that State Farm's delay in paying their claims was a display of bad faith under 42 Pa. C.S.A. § 8371. State Farm

removed the case to federal court based on diversity of citizenship. The case was tried before a jury, which awarded punitive damages to each plaintiffs in the amount of $150,000. State Farm then filed a motion for judgment as a matter of law, or, in the alternative, for a new trial, under Fed. R. Civ. P. 50(b) and 59(a). The district court denied this motion. Klinger and Neyer filed motions

**4** seeking interest, costs and attorney's fees under§ 8371. The district court awarded interest, but denied the costs and fees, opining that "State Farm ha[d] been adequately punished by the punitive awards. . . ." These appeals followed.

II. A.

State Farm first argues that the evidence was insufficient to support the jury's verdict of bad faith. It also asserts that the jury was improperly instructed on the test to be applied in determining the existence of bad faith under Pennsylvania law. It is wrong on both points.

1.The standard for bad faith claims under § 8371 is set forth in *Terletsky v. Prudential Property & Cas. Ins. Co. , 649 A.2d 680, 688 (Pa. Super. Ct. 1994)*, appeal denied , 659 A.2d 560 (Pa. 1995). There, the Pennsylvania Superior Court applied a **two-part test,** both elements of which must be supported with clear and convincing evidence: **(1) that the insurer lacked a reasonable basis for denying benefits;** and (2) **that the insurer knew or recklessly disregarded its lack of reasonable basis**. The district court instructed the jury accordingly. The Terletsky court also stated, however, that "[b]ad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Id. (quoting Black's Law Dictionary 139 (6th ed. 1990)).

From this, State Farm argues that a third element must be
**5** satisfied, to wit, that the insurer was motivated by an improper purpose such as ill will or self-interest.

We reject that reading of Terletsky . Although the definition the court recited did advert to a "dishonest purpose" such as "self-interest or ill will[,]" this is dictum. Moreover, State Farm's self-interest is the only plausible explanation for its delay. Nonetheless, we need not reach that issue: A page later the court actually applied the two- part test:

To recover under a claim of bad faith, the Terletskys were required to show that Prudential lacked a reasonable basis for partially denying payment . . . and that Prudential recklessly disregarded a lack of reasonable basis in denying the payment. Prudential's actions, however, were reasonably based. Id. at 689-90. In our prediction of how the Pennsylvania Supreme Court would measure bad faith claims, we will rely on the actual test that Terletsky applied and refrain from creating a third part based only on dictum quoted from Black's Law Dictionary . Accordingly, we conclude that the district court did not err when it instructed the jury.

2. We also believe that the evidence was sufficient for a jury to conclude that State Farm lacked a reasonable basis for refusing to pay the appellants, and knew or recklessly disregarded that fact. State Farm acknowledged at oral argument that it is chargeable with the actions of its attorney. As such, it is also chargeable with his inactions.

Moreover, Mr. Spader testified that, as early as March 1994, he knew that liability was clear and that State Farm had received a demand package indicating that both Klinger and Neyer had sustained serious injuries. Next, Wix himself testified that he advised State Farm to tender the policy limits before the damages arbitration. Yet, State Farm never offered to pay Klinger and Neyer anything beyond the early and clearly inadequate offer it made before the coverage arbitration. Finally, plaintiffs' expert testified that State Farm acted recklessly and unreasonably. Hence there is ample evidence from which a reasonable jury could

6 have concluded that State Farm knew or recklessly disregarded the fact that it had no reasonable basis for refusing to pay its insureds' claims.2 We will not disturb its verdict.

3.State Farm challenges the bad faith award to Ms. Neyer for yet another reason. Neyer demanded $115,000, but the arbitrator ultimately awarded only $70,000. Thus, State Farm argues, as a matter of law it could not have acted in bad faith by refusing to offer the full $115,000.

State Farm relies on *Kaufmann v. Aetna Cas. & Sur. Co. , 794 F. Supp. 137 (E.D. Pa. 1992)*. First, that is a district court case and not precedential. Second, there, the issue was whether the limits of multiple policies could be stacked for a total of $1 million in coverage; if they could not, the plaintiff's recovery was limited to $500,000. Aetna offered $500,000 to the plaintiffs without prejudice to its litigation of the stacking issue, and they accepted the partial settlement. The arbitrators then awarded $950,000, and Aetna timely paid over the remaining $450,000. The court opined:

Plaintiffs contend that Mr. Kaufmann's injuries were so

2. State Farm argues that it reasonably relied upon its counsel. We would never opine to the contrary, at least for certain advice and representation. Nonetheless, because this point is argued we find it necessary to remark that representation is not an excuse for the insurer's failure to perform its obligations under the policy it issued to the insured. Here, State Farm's attorney would not even answer his phone calls. With admittedly clear liability, serious injuries and Mr. Klinger on welfare because he could no longer work, it was incumbent upon State Farm to do more. And because counsel for the insureds cannot simply make an "end-run" around the insurer's attorney to deal directly with the insurer, the insurer may not hide behind this relationship to argue that it reasonably ignored its obligations under the insurance policy to its insureds, one of which is to pay them compensation if injured. Otherwise, an insurer could simply hire counsel, bury its head in the sand, pay when ordered to do so, retain the use of the insured's money in the meantime, and escape without adverse consequences.

7 severe that Aetna should have waived its contractual right to arbitration and simply tendered $1 million.. . . The arbitrators then awarded less than the full $1 million stacked limit, albeit only $50,000 less. The arbitrators' decision belies plaintiffs' contention that they were plainly entitled to the full amount which their policy provided as a limit. Under these circumstances, no reasonable factfinder could conclude that Aetna's decision to proceed to arbitration constituted bad faith.

Id. at 141.

Finally, Kaufman is not persuasive. Aetna had at least tendered the $500,000 in coverage that was not disputed, whereas State Farm never made any offer to Neyer either after the coverage arbitration was decided, or when the extent of her injuries had become clear to it. A rational jury could well have concluded that State Farm, by not making an offer to Neyer based upon some objective criteria it

believed compensated adequately for her injuries, knowingly or recklessly acted without reasonable basis. The mere fact that the arbitrators ultimately decided that Neyer was entitled to less compensation than the amount she wanted is not a sufficient basis to relieve State Farm from its responsibility to offer what was reasonably due her. Had it done so, both the damages arbitration and this suit might well have been avoided. We will not overturn the jury's verdict.

**B.** State Farm also takes issue with the jury's decision to impose punitive damages. It argues that the evidence was insufficient to support such an award and that, in any event, the matter should have been decided by the court rather than the jury. Again, we disagree.

**1.** We will look to Pennsylvania law governing punitive damages to determine whether the award was proper. Pennsylvania has adopted section 908 of the Restatement

**8**(Second) of Torts governing punitive damages. *Delahanty v. First Pa. Bank, N.A. , 464 A.2d 1243, 1263 (Pa. Super. Ct. 1983)*. They are awarded to punish a defendant for outrageous conduct, which is defined as an act which, in addition to creating "actual damages, also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights." Id. Both intent and reckless indifference will constitute a sufficient mental state. See id. Here, the district court concluded that the jury could have reasonably found that State Farm's conduct, to wit, relying on its counsel despite his non-performance and never making an offer to pay its insureds before the damages arbitration, was egregious enough to warrant punitive damages. We agree. Insurance contracts create affirmative duties: The insured must pay premiums; the insurer must pay when its insured suffers an insured event. There was testimony from plaintiffs' expert that State Farm's conduct was in reckless disregard of plaintiffs' rights because it "didn't have a good reason for not making an offer[ ]" and because State Farm was not "considering the interests of their -- of Klinger and Neyer who were their insureds." He added that "[t]hey made them no offer when there was no reason for not doing this. There was clear liability and serious injuries." When asked how he would characterize that type of conduct, he answered, "I think that's disregarding, recklessly disregarding the rights of their insured." He then stated that, in his opinion, this conduct was outrageous. This testimony provided the jury a sufficient basis to award punitive damages.

**2.** State Farm also argues that the issue of punitive damages was required by the terms of § 8371 to be decided by the court and not placed before the jury because the statute provides that "the court" may impose, inter alia , punitive damages. Frankly, we fail to see the harm. Clearly, the court can ask for an advisory verdict. Second, the court could have rejected the verdict. Finally, it was the court that entered judgment on the verdict. Hence, it had control at all stages.

**9** Moreover, as State Farm acknowledges, the Seventh Amendment itself provides the right to trial by jury in suits at common law. *See Curtis v. Loether , 415 U.S. 189, 192 , 94 S. Ct. 1005, 1007 (1974)*. Arguing, however, that the Seventh Amendment provides no right to a jury trial on punitive damages in a § 8371 case, State Farm relies on *Tull v. United States , 481 U.S. 412 , 107 S. Ct. 1831 (1987)*.

In that case, the Supreme Court held that the amount of a statutory civil penalty under the Clean Water Act could be decided by the trial court, id. at 427, 107 S. Ct. at 1840, even though the issue of liability implicated the right to trial by jury under the Seventh Amendment. Id. at 423, 107 S. Ct. at 1838. It reasoned that, because "Congress itself may fix the civil penalties, it may delegate that determination to trial judges[,]" id. at 427, 107 S. Ct. at 1840, noting that calculations of civil penalties involve exercises of discretion "traditionally performed by judges."

Id. We find Tull inapposite. Rather, we believe that the appropriate precedent is Curtis , in which the Court held that a "damages action under [42 U.S.C. § 3612] . . . is analogous to a number of tort actions recognized at common law. More important, the relief sought here-- actual and punitive damages--is the traditional relief offered in the courts of law." Id. at 195-96, 94 S. Ct. at 1009. Thus, we conclude that the punitive damages remedy in a statutory bad faith action under § 8371 triggers the Seventh Amendment jury trial right, a result consistent with several cases that have decided the issue. *See Fahy v. Nationwide Mut. Fire Ins. Co. , 885 F. Supp. 678, 679 (M.D. Pa. 1995); Younis Bros. & Co. v. CIGNA Worldwide Ins. Co. , 882 F. Supp. 1468, 1470, 1476 (E.D. Pa. 1994); MacFarland v. United States Fidelity & Guarantee Co. , 818 F. Supp. 108, 112 (E.D. Pa. 1993); Thomson v. Prudential Property & Cas. Ins. Co. , No. 91-4073, 1992 WL 210088, \*4 (E.D. Pa. Aug. 24, 1992).*3

3. State Farm relies additionally on three district court cases in which the courts held that the issue of punitive damages under § 8371 was for the court rather than the jury. *See Giampa v. State Farm Ins. Co. , No. 93-4948, 1993 WL 505614 (E.D. Pa. Dec. 8, 1993); Gilderman v. State Farm Ins. Cos. , No. 91-6353, 1991 WL 276017 (E.D. Pa. Dec. 18, 1991); Carson v. ITT Hartford Ins. Group , No. 91-3113, 1991 WL 147469 (E.D. Pa. July 24, 1991)*. Notably, however, none of these cases analyzed the issue in a Seventh Amendment context.

10 Accordingly, we will affirm the jury's award of punitive damages.

III. Klinger and Neyer appeal from the district court's decision not to award pre-judgment interest, costs and attorney's fees. We have examined their arguments with respect to the timing of pre-judgment interest and the awarding of costs and find them to be without merit. The fee issue requires a little more discussion. The district court denied attorney's fees because it believed that State Farm had been punished enough by the punitive damages the jury had awarded. This reasoning is problematic. Indeed at argument, counsel for State Farm acknowledged that the statute provides "both punitive and remedial" relief. In a general sense, punitive damages are awarded to punish the defendant for its bad faith in failing to do that which it was contractually obligated to do.

Attorney's fees, however, are awarded to compensate the plaintiff for having to pay an attorney to get that to which they were contractually entitled. Along with interest, costs and delay damages, the object of an attorney fee award is to make the successful plaintiff completely whole. **Appellants here were put to the unnecessary expense of having to hire an attorney by State Farm's refusal to do for them what it had contracted to do.** Hence, **appellants were damaged economically as surely as if State Farm had purposely or negligently rammed one of its automobiles into appellants'.** The obvious design of the Pennsylvania statute is, first, to place Klinger and Neyer in the same economic position they would have been in had the insurer performed as it promised, by awarding attorney's fees as additional damages; and second, to punish State Farm for giving primacy to its own self-interest over that of the appellants by awarding punitive damages. The separate provisions of this statute answer both needs. Thus, it would appear that in refusing to award attorney's fees because the defendant had been "punished" enough, the court erred. Nonetheless, we believe that the error was only in how the court explained the award, but not in its application of the law.

11 The district court obviously intended to both punish State Farm and to make the appellants whole, and it believed that the punitive damage award accomplished both. Hence, we conclude that a remand is unnecessary.

**IV.** Because the district court's rulings on the merits were legally correct and the jury's verdicts supported by sufficient evidence, we will affirm State Farm's cross- appeals; and because the court's error is harmless and it is unnecessary to remand, we will also affirm Klinger's and Neyer's primary appeals.

A True Copy:

Teste:

In the United States Court of Appeals
For the Seventh Circuit

No. 00-3473

Michael Downey,

Plaintiff-Appellee,

v.

State Farm Fire & Casualty Co.,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 98-1118--Michael M. Mihm, Judge.

Argued March 29, 2001--Decided September 17, 2001

Before Easterbrook, Rovner, and Diane P. Wood, Circuit Judges. Easterbrook, Circuit Judge. Michael
Downey lives on a hill in Peoria, Illinois. His back yard runs downward at a 35ø angle, creating a danger
of soil
erosion that could compromise the foundation of his house. A retaining wall supported the soil, but in
February 1997
heavy rain washed away the wall and much of the soil that it had been retaining. This in turn caused the
house's
foundation to shift and become unstable. Fortunately (or so he thought) Downey had purchased flood
insurance. State Farm
Fire & Casualty Co., from which Downey bought the policy, paid to fix cracks in the foundation but
denied indemnity for
the expense of stabilizing the house toward off collapse. Injury caused by the failure of the retaining
wall, State Farm asserted, is excluded from coverage. State Farm lost in the district court and on appeal
challenges the district judge's
interpretation of the policy. Before reaching the merits, however, we must consider both subject-matter
and appellate jurisdiction.

Our ears pricked up at the assertion that this suit belongs in federal court, for a contract dispute between
two private parties typically does not arise "under the Constitution, laws, or treaties of the United
States", 28 U.S.C.sec. 1331, and the complaint does notallege diversity of citizenship. State Farm's brief
asserts that federal-question jurisdiction exists but does not
explain why; Downey concurred in State Farm's presentation. Because the presentations at oral
argument were unilluminating, we directed the parties to file supplemental memoranda addressing
jurisdictional issues. Their responses focus on the nature of the insurance. Downey bought his policy
through the National Flood Insurance Program (nfip),
codified at 42 U.S.C. sec. 4001-4129. This national system of flood insurance for residents of
high-risk areas regulates the transactions between Downey and State Farm, and the parties offer three
reasons why the upshot is a question within federal jurisdiction.

State Farm points to an explicit grant of jurisdiction in 42 U.S.C. sec. 4053:

[U]pon the disallowance by any such company or other insurer of any such claim . . . the claimant, within one year after the date of mailing of notice of disallowance or partial disallowance of the claim, may institute an action on such claim against such company or other insurer in the United States district court for the district in which the insured property or the major part thereof shall have been situated, and original exclusive jurisdiction is hereby conferred upon such court to hear and determine such action without regard to the amount in controversy.

Although Downey is a "claimant" and State Farm an "insurer", Downey's action against State Farm is not a "claim" under
sec. 4053--State Farm looked at the wrong part of the statute. When Congress created the nfip it gave the program's administrator two ways to execute the program and discretion to choose between them. The first method, the "Industry
Program," allows a pool of private insurers to underwrite flood insurance with financial backing from the government. See 42 U.S.C. sec. sec. 4051- 56. The "Government Program," the second option, allows the government to run the nfip itself--offering federally underwritten policies-- with the potential for administrative assistance from private insurers. See 42 U.S.C.
sec. sec. 4071-72. See Edward T. Pasterick, The National Flood Insurance Program, in Howard Kunreuther & Richard J. Roth, Sr., eds., Paying the Price: The Status and Role of Insurance Against Natural Disasters in the United States (1998), for an explanation of the nfip. In 1977 the Secretary of Housing and Urban Development, who ran the nfip at the time (it has since been taken over by the Federal Emergency Management Agency), decided that the Industry Program was unworkable and ended it. He then implemented the Government Program, which has continued to the present. Section 4053, the grant of jurisdiction to which State Farm points, enables only claims brought "under this part"- -the nfip as run under the Industry Program. State Farm, then, is 24 years too late to take advantage of sec. 4053. Courts occasionally make the same error. See
*Froelich v. Catawba Insurance Co., 10 F. Supp. 2d 597 (W.D. Va. 1998); Gagliardi v. Omaha Property & Insurance Co., 952 F. Supp. 212 (D. N.J. 1997)*. Like the eleventh circuit, *Newton v. Capital Assurance Co., 245 F.3d 1306 (2001)*, we avoid this pitfall.

Downey observes that the Government Program has its own jurisdictional provision, 42 U.S.C. sec. 4072:

In the event the program is carried out as provided in section 4071 of this title, the Director [of fema] shall be authorized to adjust and make payment of any claims for proved and approved losses covered by flood insurance, and upon the disallowance by the Director of any such claim . . . the claimant . . . may institute an action against the Director on such claim in the United States district court for the district in which the insured property or the major part thereof shall have been situated, and original exclusive jurisdiction is hereby conferred upon such court to hear and determine such action without regard to the amount in controversy. Yet this section allows only "an action against the Director". Downey sued State Farm. He might have thought that State Farm is the only proper defendant: In1983 fema created the Write-Your-Own Program (wyop), which allows private insurers to issue and administer flood-risk policies under the Government Program. The private insurers also defend suits arising from the policies. 44C.F.R. sec. 62.23(d). Perhaps Downey figured that, because he contracted with State Farm, he had to sue State Farm. Neither party appears to have noticed 44 C.F.R. sec. 62.22, which permits suits against the Director of fema arising from decisions made by wyop insurance companies. This regulation effectively allows a direct action against the person who is ultimately

responsible, rather than the wielder of delegated authority. But Downey sued State Farm rather than the Director and is stuck with that choice. Section 4072 does not mention the wyop or indicate that anyone other than the Director may be sued under this grant of jurisdiction.

Nonetheless, Downey insists, with the support of *Van Holt v. Liberty Mutual Fire Insurance Co., 163 F.3d 161 (3d Cir.1998)*, that, because "a suit against a wyo company is the functional equivalent of a suit against fema", we should look past the caption of this case and pretend that the Director is the defendant. This position is not without force: fema provides a standard text for all nfip policies and forbids wyop companies from making changes; fema's interpretations of the policy bind all wyop participants; fema decides what rates may be charged; all premiums are remitted on to fema (minus a small fee); if wyop companies pay out on a claim they get reimbursed by fema; likewise with litigation costs. See generally 42 U.S.C. sec. 4081; 44 C.F.R. sec. sec. 62.23-62.24. So although private insurers issue the policies, fema underwrites the risk. The insurance companies handle administrative business for fema by selling policies and processing claims but do little else (unlike the Industry Program, where the private companies underwrite the risks). Arrangements like this make sense. Fema likely is unsuited to tasks such as selling insurance and collecting fees, and even less adept at processing individual claims for flood damage. By purchasing the services of a more efficient claims processor, fema saves money. We see a similar structure in the Medicare program: Health care providers seek reimbursement, not directly from the government but from "fiscal intermediaries"--usually private insurance companies-- that act as the claims processor in the government's stead. *See Your Home Visiting Nurse Services, Inc. v. Shalala, 525 U.S. 449 (1999)*.

In a sense, then, State Farm is a place-holder for fema, but does this fact have jurisdictional significance? Downey might have something if for jurisdictional purposes courts typically look to see who will be affected by a decision; but we don't. This would be clear enough in an ordinary tort dispute between two Illinois citizens. If the plaintiff in such a suit agreed to pay any proceeds from the judgment to an out-of-state insurance company (who, let's say, in return agreed to pay his medical bills), would a court peek behind the formality of the non-diverse parties and recognize that those who truly have something to gain or lose--the insurance company and the Illinois defendant--are diverse? Surely not. Nor do courts look past corporate form to the citizenship of the shareholders or other investors. There is a special rule for administrators of estates, 28 U.S.C. sec. 1332(c)(2), but normally the status of the named litigant governs--provided that the litigant is an entity rather than a name for an unincorporated association such as a partnership. *See Carden v. Arkoma Associates, 494 U.S. 185 (1990); Indiana Gas Co. v. Home Insurance Co., 141 F.3d 314 (7th Cir. 1998)*. For example, the citizenship of a trustee rather than the trust beneficiary is dispositive under sec. 1332. *Navarro Savings Association v. Lee, 446 U.S. 458 (1980)*. Downey cannot escape the same conclusion: Although a judgment against State Farm may come out of the federal treasury--creating a federal interest--the only litigants are in the private sector. Because we see no good reason to disregard not only the identity of the litigants **but also the fact that sec. 4072 is limited to suits against the Director**, we decline to adopt Van Holt's reasoning. (For purposes other than jurisdiction the economic incidence of the decision sometimes matters. Compare *Montana v. United States, 440 U.S. 147 (1979)* (for purposes of claim preclusion courts may look behind the nominal parties to a suit), with *Regents v. Doe, 519 U.S. 425 (1997)* (for purposes of sovereign immunity courts should look exclusively at the parties).)

This is not the end of the jurisdictional inquiry, however. Sometimes the federal interest in a controversy is so dominant that federal law applies--activating federal-question jurisdiction under sec. 1331--even if the national government is not a party. *See National Farmers Union Insurance Cos. v. Crow Tribe of Indians, 471 U.S. 845 (1985)*. The fifth circuit has held, see

*West v. Harris, 573 F.2d 873 (1978)*, that because the nfip is a federal program, uniform judicial interpretations of the standard insurance policies are necessary. Every other circuit that has considered this issue has followed West's approach either explicitly or implicitly. *See Linder & Associates, Inc. v. Aetna Casualty & Surety Co., 166 F.3d 547 (3d Cir. 1999); Flick v. Liberty Mutual Fire Insurance Co., 205 F.3d 386 (9th Cir. 2000); Newton, supra (11th Cir.). Cf. Atlas Pallet, Inc. v. Gallagher, 725 F.2d 131 (1st Cir. 1984); Leland v. Federal Insurance Administrator, 934 F.2d 524 (4th Cir. 1991); Berger v. Pierce, 933 F.2d 393 (6th Cir. 1991); Nelson v. Becton, 929 F.2d 1287 (8th Cir. 1991).* We assumed the same result in *Sodowski v. National Flood Insurance Program, 834 F.2d 653 (7th Cir. 1987)*, and now so hold.

In 1978, when West was decided, most judges assumed a nation-wide program automatically leads to federal common
law. *Atherton v. FDIC, 519 U.S. 213 (1997)*, has complicated matters. Atherton considered the question whether federal
law provides the standard of care in derivative litigation involving the directors and officers of a federally chartered lending institution. Although a federal statute was also at issue, the Court first considered and rejected the proposition that federal common law could displace the state rule for the internal affairs of corporate entities, holding that, although an imperative of
uniformity is enough to call for federal common law, the federal nature of a program alone does not demonstrate a need
for uniformity. That analysis applies equally here. Neither the parties to this appeal nor any case we could find articulate any reason for uniformity of interpretation other than the very one Atherton rejected. None even takes notice of Atherton.

Not proscribed by Atherton is a narrower ground for applying federal common law. C*learfield Trust Co. v. United States,
318 U.S. 363 (1943)*, establishes that, when the duties or rights of the United States are at stake under a federal program, that federal interest requires the application (and if necessary the creation) of federal law. For example, *United States v. Kimbell Foods, Inc., 440 U.S. 715 (1979)*, considered what law governs the priority of liens that secure federal agencies' loans to private parties. The Court reasoned, citing Clearfield Trust, that the liens implicated the agencies' rights under federal programs created by "specific Acts of Congress", which meant that federal law had to apply--though the Court then borrowed that federal law from state law. *See also United States v. Little Lake Misere Land Co., 412 U.S. 580 (1973)*. Typically the United States is a party to disputes that call for federal law under the approach of Clearfield Trust. *See, e.g., Priebe & Sons v. United States, 332 U.S. 407 (1947); United States v. Standard Oil Co., 332 U.S. 301 (1947).* But there is no reason to view
that condition as a necessity. If fema were the defendant in our case, we would have no doubt that federal law applied: Just like the agencies in Kimbell Foods, fema runs a federal program, and because it bears the risk on all nfip contracts, fema's duties are at issue whenever an nfip policy is interpreted. Replacing "fema" with "State Farm" in the caption of the case changes nothing; a judgment against State Farm and a judgment against fema have identical effects: fema pays. And
though we were concerned with the formal parties to this action when we interpreted sec. 4072, here we are concerned with the federal interest invoked by the dispute's subject matter.

The federal interest is no less here than in *Turner/ Ozanne v. Hyman/Power, 111 F.3d 1312 (7th Cir. 1997)*, which
applied federal common law to a dispute between two contractors in a construction project for the United States Postal

Service. Hyman/Power, the general contractor, agreed in its contract with the usps to indemnify the agency for any

on-the-job injuries. Turner/Ozanne, the usps's on-site overseer for the project, then sought indemnification from

Hyman/Power on the theory that as a "representative" of the usps it should be treated as the usps. Although the dispute

affected only private rights--the Postal Service had nothing to lose or gain—we held that, because Turner/Ozanne invoked

a protection it had negotiated with the United States and because both parties were involved in an ongoing federal

project, a federal question was present. Today's disagreement presents both characteristics-- Downey contends that he

bought protection from the government through a federal program--and here the government coffer is at risk. That is

enough to justify the application of federal law to the dispute, which means that subject-matter jurisdiction arises

under sec. 1331.

Having assured ourselves that this dispute was properly before the district court, we now must inquire whether State

Farm can ask us for relief. In two orders the district court held that the policy covers Downey's claim. At this point only

the calculation of damages remained for the district court to accomplish. State Farm then offered to allow judgment in

Downey's favor in the amount of $186,360.54. See Fed. R. Civ. P. 68.Downey accepted, and at the parties'joint request the district court then entered a final judgment against State Farm expressly reserving "State Farm's right to pursue an appeal from the [liability] orders of this Court".

An agreement among the parties to enter a judgment may create nothing adverse from which to appeal. How can State Farm

contend that it is aggrieved by a judgment that it consented to? Appeals are taken not from issues but from judgments. *See California v. Rooney, 483 U.S. 307 (1987)*. Parties often stipulate to issues such as damages once the district court resolves liability, but an agreement on a specific issue differs from asking the court to enter judgment, which winds up the case itself. In criminal cases courts allow conditional guilty pleas (with the district judge's consent) followed by appeal on a reserved issue, because Fed. R. Crim. P. 11(a)(2) expressly allows such a tactic, but the civil rules do not have a parallel provision. One might think, therefore, that if a judgment is not contested in the district court then the adversarial process has ended and the court of appeals has no role to play.

Yet for jurisdictional purposes there is no distinction between "consent" and "adversarial" judgments. Judgments are judgments, and any party can appeal as of right from a final decision adverse to his interests. So says 28 U.S.C. sec. 1291, which allows appeal from "all final decisions of the district courts". Finality is the necessary and sufficient condition. Distinguishing between final judgments entered with the consent of both parties and final judgments entered against one party's wishes would create an extrastatutory condition on appeal. This has little to recommend it, and the possibility has been rejected by the Supreme Court. *See Pacific R.R. v. Ketchum, 101 U.S. 289, 295 (1880)*. Ketchum interpreted an earlier version of the statute, but the critical language has survived. *See INB Banking Co. v. Iron Peddlers, Inc., 993 F.2d 1291 (7th Cir. 1993)*, applying Ketchum to the current version of sec. 1291.

State Farm is not home free, however. Although the Supreme Court has held that "consent judgments" are final and

appealable under sec. 1291 (so appellate jurisdiction is secure) the Court has added that the act of giving consent

usually waives the consenting party's right to review, leading to affirmance "without considering the merits of the

cause." *Nashville, Chattanooga & St. Louis Ry. v. United States, 113 U.S. 261, 266 (1885). See also Swift & Co. v.*

*United States, 276 U.S. 311 (1928); United States v. Babbitt, 104 U.S. 767 (1882)*; *Association of Community*

*Organizations for Reform Now v. Edgar, 99 F.3d 261 (7th Cir. 1996).* Waiver affects, not a court's power to hear the case, but whether as a practical matter it has any job to do. So did State Farm waive its right to appellate consideration? Both the Offer of Judgment and the district court's judgment reserved State Farm's right to challenge the liability determination. A reservation of rights is incompatible with waiver. *See Cutting v. Jerome Foods, Inc., 993 F.2d 1293 (7th Cir. 1993); Hudson v. Chicago Teachers Union, 922 F.2d 1306 (7th Cir. 1991)*. Almost every circuit that has considered the issue has held that an express reservation of the right to appeal avoids waiver of contested issues that had been resolved earlier in the litigation. See

*BIW Deceived v. Local S6, 132 F.3d 824 (1st Cir. 1997); Keefe v. Prudential Property & Casualty Insurance Co., 203*

*F.3d 218 (3d Cir. 2000); Cohen v. Virginia Electric & Power Co., 788 F.2d247 (4th Cir. 1986); Slaven v. American Trading Transportation Co., 146 F.3d 1066 (9th Cir. 1998); Mock v. T.G. & Y. Stores Co., 971 F.2d 522 (10th Cir. 1992); Shores v. Sklar, 885 F.2d 760 (11th Cir. 1989) (en banc)*. Only the fifth circuit gives no effect to an express reservation of appellate rights. *See Amstar Corp. v. Southern Pacific Transport Co., 607 F.2d 1100 (5th Cir. 1979)*. Amstar, however, offered no explanation of its holding and so gives us no reason to doubt our own conclusion: State Farm preserved its rights, and we may reach the merits.

The parties came to blows over many issues in the district court, but on appeal only one dispute remains: Does Downey's nfip policy cover the cost of shoring up the soil around his house after the retaining wall failed at the task? The 1997 storm (which the parties now agree caused a "flood" under the policy) washed away the retaining wall and a lot of soil. According to David

Maurer, a structural engineer whose opinion State Farm does not contest, this removal of soil from the northwest corner of the house led to cracks in the foundation and caused the western exterior wall to tilt outward. Because that wall bears the weight of the second story bedroom, the tilt created, in Maurer's opinion, a "danger of partial collapse unless the movement [was] stopped." Maurer recommended the changes that Downey implemented and for which he now seeks reimbursement—installing gabion baskets and rocks in the hillside and injecting grout into the ground underneath the house. State Farm paid to fix the cracks in the house but insists that rendering the house stable and safe for occupancy is outside the scope of the
contract.

The nfip policy covers only Downey's "dwelling" and explicitly excludes from coverage "[f]ences, retaining walls, seawalls, bulkheads, wharves, piers, bridges, and docks." (Emphasis added.) State Farm argues that this clause relieves it of obligation to indemnify not only damage to a retaining wall but also damage to a house caused by damage to a retaining wall. The district court found little to support this reading. Neither do we. The policy covers "any loss [to the dwelling] in the nature of

actual loss of or physical damage, evidenced by physical changes, to the insured property . . . which is directly and proximately caused by a flood". (Emphasis deleted.) State Farm does not contend that the "physical changes" to the house were not symptomatic of "physical damage" and likewise makes no argument that the flood was not a proximate cause of that damage. End of story. If there is physical damage to the house, and that damage was caused by a flood, how can the policy not provide coverage? State Farm does not contend that the repairs Downey made were unjustifiable or excessive (for the parties settled all disputes about the amount of indemnity, if any is available). The retaining-wall exclusion is irrelevant. It puts no limitation on what types of flood damage to a house are covered. Had Downey installed a new retaining wall, the policy would not cover the expense. But he didn't; he fixed his house.

This understanding still leaves meaning in the retaining-wall exclusion: If the flood caused damage to the retaining wall with no loss of stability to the house, the policy would not cover the loss. If the retaining wall had supported a barn rather than Downey's bedroom, the policy would not cover the loss. Remember that this policy is a standard form for use by all nfip participants. It must, therefore address as many complications as possible; not all provisions will be relevant to every property owner. So the exclusion has plenty of work to do—just not in this situation. There is, however, no more work for us to do: the repairs Downey undertook to stabilize his house are covered by the policy, and State Farm must pay up. The parties settled all other differences in the district court.

Affirmed

E
X
H
I
B
I
T

A
S

FERRY, JOSEPH & PEARCE, P. A.

ATTORNEYS AT LAW

824 MARKET STREET

SUITE 904

P. O. BOX 1351

WILMINGTON, DELAWARE 19899

(302) 575-1555

DAVID J. FERRY, JR.*
MICHAEL B. JOSEPH +
ROBERT K. PEARCE
THEODORE J. TACCONELLI *
EDWARD F. KAFADER
JOHN D. MATTEY
RICK S. MILLER
JASON C. POWELL
LISA L. COGGINS **
STEVEN G. WEILER ++
THOMAS R. RIGOS

TELEFAX
(302) 575-1714

www.ferryjoseph.com

ARTHUR F. DISABATINO
(1936-2001)

March 21, 2006

(*ALSO PA BAR)
(+ALSO NJ BAR)
(**ALSO FL, MA AND NY BARS)
(++NJ BAR ONLY)

Ms. Cathy Brooks-McCollum
PO Box 12166
Wilmington, DE 19850

RE:   **Cathy D. Brooks-McCollum v. Emerald Ridge Service Corporation et al**
**Chancery Court No. 147-N**

Dear Ms. Brooks-McCollum:

I have previously indicated to you that the Emerald Ridge Service Corporation is willing to issue you a check in the amount of $185.00 for your payment of a power washing bill upon some proof that you actually have paid that bill. Will you please supply me with either a cancelled check or some other document that you think indicates that the bill has been paid. Upon receipt of proper proof of payment, the Corporation will issue a check payable to you in the amount of $185.00.

Sincerely,

Edward F. Kafader

EFK/lma

cc: Mr. Mark Martell

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

Cathy D. Brooks-McCollum
& On behalf of
Emerald Ridge Service Corporation Derivative Action
As a Director
PO Box 12166
Wilmington, DE 19850
(302) 521-1241
mccollumc1@comcast.net
**(PLAINTIFF)**

**CIVIL ACTION NO: 04-419 (JJF)**

**JURY TRIAL REQUESTED**

vs.

State Farm Insurance Company
**(DEFENDANTS)**

**PROOF OF SERVICE**

I Cathy D. Brooks-McCollum hereby certify that on the th day of December 2007, I will and have caused

to be served a true and correct copy of the foregoing Reply Brief On Summary Judgment electronically upon

defendants:

Casarino, Christman & Shalk
Stephen P. Casarino
800 North King St, Suite 200
P.O. Box 1276
Wilmington, DE 19899
(302) 594-4500
(302) 594-4509 Fax

/s/ Cathy D. Brooks-McCollum (Pro Se)
PO Box 12166
Wilmington, DE 19850
(302) 521-1241